146 N.J. Super. 169 (1976)
369 A.2d 49
CITY OF BRIDGETON, IN THE COUNTY OF CUMBERLAND, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
B.P. OIL, INC., A CORPORATION OF THE STATE OF OHIO, AUTHORIZED TO DO BUSINESS IN NEW JERSEY, AND ANDREWS OIL COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY. DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 17, 1976.
*171 Mr. Allan H. Harbert for plaintiff.
Mr. Ira G. Megdal for defendant B.P. Oil, Inc. (Messrs. Hyland, Davis & Reberkenny, attorneys).
Mr. Michael Brooke Fisher for defendant Andrews Oil Company, Inc. (Messrs. Lummis, Moore, Fisher, Pancari & Pagliughi, attorneys).
MILLER, J.C.C., Temporarily Assigned.
Two summary judgment motions have been brought in a case which presents the following factual situation. Defendants B.P. Oil Company, Inc. and Andrews Oil Company, Inc. are the owner and lessee, respectively, of real estate located in the City of Bridgeton. Leaks occurred in certain gasoline or fuel oil tanks located thereon. The City of Bridgeton used its employees to prevent the spread of the resulting oil spill. Its fire department was present at the site for a week and it expended money for extensive overtime work. The city further purchased special equipment and chemicals for this purpose. In this action the municipality is attempting to collect these ascertaining expenses from the two named defendants. Each defendant has moved for summary judgment.
The first motion is brought by Andrews Oil, the lessee of the premises where the leak occurred. It claims that discovery demonstrates that it was not negligent and further argues that, in any case, the city does not have the power to charge individuals for expenses incurred by its fire department. Thus the first issue for resolution is whether either or both of the defendants would be liable to a proper plaintiff under these circumstances. The second issue is whether the city is a proper plaintiff in this suit.
*172 In considering the question of liability, for the purposes of this summary judgment motion all facts must be construed in a light most favorable to plaintiff. Judson v. Peoples Bank Co. of Westfield, 17 N.J. 67 (1954). An unresolved fact issue exists as to whether or not the equipment on the property was in good repair or was in such a state of disrepair as to have been the cause of the leak.
A consideration of common law principles regarding the storage of dangerous substances on the land is informative. In Exner v. Sherman Power Const. Co., 54 F.2d 510 (2 Cir.1931), the court considered a fact situation wherein dynamite which defendant kept on its property exploded injuring plaintiff. The court noted that there was a question of whether there was an absolute liability under common law for the damages caused by the blast. It stated that there should not be different standards of liability for the results of an explosion depending on whether the explosion was a result of storing dynamite or a result of using it in blasting operations. In holding that imposing absolute liability is not out of accord with any general principle of law, the court stated:
As Professor Holdsworth has said: "The dominant idea of Anglo-Saxon law" was "that man acts at his peril." 2 History of English Law, 42. See, also, Pollock on Torts (10th Ed.) 15. Accordingly the earlier forms of action such as trespass and trespass quare clausum fregit allowed recovery for a direct invasion of person or property without regard to fault. After the later action "sur case" arose, there was a growing tendency to excuse an act causing damage if the defendant was without fault. But, in trespass, fault ordinarily remained a matter of no consequence, and even in cases of damage to the person the early decisions prior to Brown v. Kendall, 6 Cush. (60 Mass.) 292, seemed to have imposed liability where there was no negligence. Dickenson v. Watson, T. Jones, 205. Although liability for injury to the person has not in most instances survived except where there has been fault, there still remains absolute liability for trespasses to real estate and for actionable wrongs committed by servants no matter how carefully they are selected by the master. The extent to which one man in the lawful conduct of his business is liable for injuries to another involves an adjustment of conflicting interests. The solution of the problem in each particular *173 case has never been dependent upon any universal criterion of liability (such as "fault") applicable to all situations. If damage is inflicted, there ordinarily is liability, in the absence of excuse. When, as here, the defendant, though without fault, has engaged in the perilous activity of storing large quantities of a dangerous explosive for use in his business, we think there is no justification for relieving it of liability, and that the owner of the business, rather than a third person who has no relation to the explosion, other than that of injury, should bear the loss. The blasting cases seem to afford ample analogies and to justify this conclusion. [at 514]
The courts in Rylands v. Fletcher, 3 H. & C. 774 (Exch. 1965), rev'd L.R. 1 Exch. 265 (1866), rev'd L.R. 3 H.L. 330 (1868), is the first case to consider in depth the issue of liability without fault.
In that case defendants constructed a reservoir to collect water. The reservoir was built over a shaft of an abandoned coal mine. After the water collected in the reservoir, the water broke into the shaft, flowed into the abandoned mine on defendant's land, and from there flowed into plaintiff's mine, doing damage there. The Court of Exchequer held that defendants were not negligent and that it was not a situation where the landholder was liable for the action of an independent contractor. Therefore, it did not impose liability. The Exchequer Chamber reversed the decision of the lower court and the House of Lords affirmed its reversal. The controlling rule of law was stated in the Exchequer Chamber.
We think that the true rule of law is, that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape. He can excuse himself by shewing that the escape was owing to the plaintiff's default; or perhaps that the escape was the consequence of vis major, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient.
Applying this rule in to the case at bar, a lessor who collected and kept the oil on his land, knowing that it was likely to do mischief if it escaped, kept it at his peril, and, *174 when it escaped became liable for the damages it caused. There is no evidence at this state in the proceedings to show that the escape of oil was proximately caused by anything else such as fault of the plaintiff or an act of God.
Our New Jersey courts have followed a version of the rule stated in Rylands v. Fletcher, supra. In Brownsey v. General Printing Ink Corp., 118 N.J.L. 505 (1937), plaintiff was injured when a slab of ice and snow fell off defendant's garage roof onto his neighbor's land where plaintiff was an invitee. There was no trough or structural safeguard on the roof to prevent such accident. The court cited Rylands v. Fletcher, noting that the case had been accepted in some jurisdictions, but rejected in others. It stated that in New Jersey negligence principles normally govern the relationship of owners of contiguous plots of land. The court held [at 511] that the proper factual inquiry was whether "a reasonably prudent man circumstanced as appellant was and mindful of his legal duty not to subject his neighbor to an unreasonable hazard, would have so acted * * *." The rule, as thus stated, indicates a reliance on negligence principles, but imposes a higher than normal standard for his action when a person constructs a hazardous condition. In Black v. Public Services Elec. & Gas Co., 56 N.J. 63 (1970) the court noted [at 76] that when there is a duty to anticipate danger, a sequential duty to "exercise care commensurate with the risk inevitably arises."
Restatement, Torts 2d follows the rule set forth in Rylands v. Fletcher, supra. In this case the oil in the tanks belonged to Andrews Oil, the lessee. It is unclear from the facts presented which defendant was responsible for the contruction of the facilities. Therefore, two sections of the Restatement are relevant here.
§ 364. Creation or Maintenance of Dangerous Artificial Conditions
A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if

*175 (a) the possessor has created the condition, or
(b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, or
(c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it. [2 Restatement Torts 2d, § 364 at 259-260 (1965)]
§ 366. Artificial Conditions Existing When Possession is Taken.
One who takes possession of land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons or property outside of the land is subject to liability for physical harm caused to them by the condition after, but only after,
(a) the possessor knows or should know of the condition, and
(b) he knows or should know that it exists without the consent of those affected by it, and
(c) he has failed, after a reasonable opportunity, to make it safe or otherwise to protect such persons against it. [Id. § 366 at 264]
Under these two sections Andrews Oil, the lessee would be liable for harm caused by storing the oil, whether it created the condition itself or whether B.P. Oil, the owner had created the condition before it took possession of the land.
International law has recognized the necessity for dealing with marine pollution. In 1954 an oil pollution convention was signed which prohibited discharges of oil or oily mixtures from ocean-going vessels. The enforcement provisions of this convention limited its effectiveness.
A 1973 conventon has stronger enforcement provisions than that of 1954. It contains extensive regulations regarding construction criteria, equipment and operating procedures to prevent discharges. It explored the authority of states to inspect vessels for violation of the convention regulation. See Williams, "Enforcement of the 1973 Marine Pollution Convention," United States Naval Institute, Proceedings December 1976, at 39-45. Such concern transcends national boundaries and interests. See, for example, an advertisement by the Kingdom of Saudi Arabia, New York Times, December 17, 1976, at A25.
In the United States and in New Jersey legislation has been passed to deal with water pollution. 33 U.S.C.A. § 1251 establishes a national policy for the prevention, control *176 and abatement of water pollution. 33 U.S.C.A. § 1251 et seq. sets forth the Federal Government's plan for preventing and controlling water pollution. Among other provisions, grants are established for funds for research and various pollution control programs, and standards and enforcement procedures are established.
N.J.S.A. 26:3B-4 prohibits the storage of polluting matter so that it gains access to bodies of water "in such a manner as to cause or threaten injury to any inhabitant of this State, either in health, comfort or property, or to cause or threaten degradation of water quality resulting in damage to the acquatic community of wildlife in and adjacent to the affected water body." N.J.S.A. 58:10-23.2 states that "The Legislature finds and declares that the discharge of petroleum products * * * into the waters of this State is inimical to the best interests of the people and constitutes a threat to the environment * * *." Both the State and Federal Governments have enacted legislation which authorizes the assessment of costs expended in cleaning up oil spill to persons who cause such spills. N.J.S.A. 58:10-23.1 et seq.; 33 U.S.C.A. § 1321.
The principles followed by New Jersey courts in negligence cases which present the same factual situations as is addressed by statute have rarely been as well expressed as in Evers v. Davis, 86 N.J.L. 196 (1914):
Upon common-law principles, therefore, when the Legislature has by public statute established a certain standard of conduct in order to prevent a danger that it foresaw, it has in this regard forewarned the "ordinary prudent man," and through him the defendant in a civil action, whose conduct must always coincide with this common-law criterion. Such danger therefore, does not have to be proved by the plaintiff, since there is no longer room for a reasonable difference of opinion, for by his breach of the statute the defendant, through his common-law conscience, is charged with knowledge that if injury ensues he will have acted at his peril. [at 204]
See also, Moores Trucking Co. v. Gulf Tire and Supply Co., 18 N.J. Super. 467 (App. Div. 1952), certif. den. 10 N.J. *177 22 (1952); Hardman v. Ford Motor Co., 70 N.J. Super. 275 (App. Div. 1961), and Braitman v. Overlook Terrace Corp., 68 N.J. 368 (1975).
While in New Jersey the concept of strict liability regardless of negligence has been developed in products liability cases, see Herbstman v. Eastman Kodak Co., 68 N.J. 1 (1968), it has not yet been extended to tort cases such as the one at bar. As can be seen, however, there is a varying standard of care required in negligence cases, depending on the amount of danger involved in the activity engaged in. In the case at bar the activity, storage of oil, created a substantial risk, and defendant therefore had a high standard of care imposed on him. Coupling the standard of care established by statute with the requirements for high standard because of the inherent dangers involved in the storage, defendant must be required to exercise an extremely high burden. As has been discussed, strict liability has been applied to products liability cases. In view of our developing insight into the impact of pollution upon the environment because of the nature of this activity and the statutory prohibition against pollution, this is the proper time to extend the concept of strict liability in this state to those who store ultrahazardous or pollutant substances. This means that a defendant becomes liable for damages caused to a proper plaintiff.
This rule is in reality neither new nor novel. For generations it has been the common law rule that an owner of realty is required to refrain from injury to the land of his neighbor. "Sic utere tuo ut alienum non laedas" is older than "When in the course of human events * * *." 9 Coke 59; 1 Blackstone Commentaries 306; Harper and James, Law of Torts, § 1.24 at 71 (1965).
The developing stream of legal thought flows without difficulty and inexorably in the direction of such liability. As a society we are constantly made aware of the diminishing quantity and quality of our environment. Save, hopefully, in its ideals this is no longer the land of our fathers with its *178 limitless bounty from sea to sea. This generation of Americans has seen its bounty wasted by mindless and reckless misuse. It has further seen the almost unchecked development of products whose misuse or improper employment leads to disfigurement and death. The law is not  or ought not be  so feeble as to exonerate those whose conduct causes harm to others by reason of such use or abuse.
The next issue which must be addressed is whether a city is, under these facts, a proper plaintiff. The court has noted the growing "cost-accounting" procedures wherein cities charge for their services and notes that the State and Federal Governments have enacted legislation which authorizes the assessment of costs expended in cleaning up oil spills to persons who cause the spill. N.J.S.A. 58:10-23.1 et seq.; 33 U.S.C.A. § 1321.
The city here does not rely on an ordinance which would be equivalent to the state or federal legislation. It merely asserts a common law premise that when ones' action causes excessive use of its fire department, that person should pay for its services. It was proposed by counsel for the city that such justification for charging for services of the fire department would also apply to the situation of a person causing a fire by smoking in bed.
It has been stated that "It cannot be a tort for government to govern." Amelchenko v. Freehold, 42 N.J. 541, 550 (1964). Neither is government a saleable commodity. N.J.S.A. 40A:14-7 authorizes local government to establish fire departments. While at one time it was a private function, in 1976 one of governments duties is that of fire protection.
Governments, to paraphrase the Declaration of Independence, have been instituted among men to do for the public good those things which the people agree are best left to the public sector. Since our country was founded there has developed a widening horizon of public activity. True, certain activities have developed in areas from which revenue has been derived, such as turnpikes, water or power *179 supply, or postal services. Nevertheless, there remains an area where the people as a whole absorb the cost of such services  for example, the prevention and detection of crime. No one expects the rendering of a bill (other than a tax bill) if a policeman apprehends a thief. The services of fire fighters are within this ambit and may not be billed as a public utility.
For these reasons the city cannot be considered a proper plaintiff in attempting to recover damages from a party who used the services of its fire department.
To summarize, this court holds that the possessor of a pollutant keeps it on his premises at his peril. If it escapes he is answerable to one who suffers a provable loss thereby. The policy of the law in this State and of society in general makes this a case of strict liability rather than of negligence. The court further holds that a municipal corporation may not recover as damages the costs of its governmental operations which it was created to perform, but it is not to be denied recovery for other losses by reason of its status as a municipal corporation. Cost accounting must have a limiting factor somewhere, and that limit is reached when the function affected is a part of the act of government.
Thus, if the city were the owner of adjacent land damaged by escaping oil, it, like all landowners, may recover damages caused by this escape. It cannot, however, recover costs incurred in fire prevention or extinguishment. That is the very purpose of government for which it was created.
The landowner also argues in his summary judgment motion that provisions of the lease exempt it from liability. At oral argument a fact issue developed as to whether the owner repreesnted that it would, in fact, be responsible to the city for cleaning up the spill. Therefore, the landowner cannot be considered exempt from liability under the terms of the lease agreement. As has been decided herein, the city cannot collect damages from the lessee for its attempts to clean up the spill. If the facts were to develop that the city's action was taken only because it was told by the owner that it *180 would be reimbursed, an action for breach of contract would be appropriate. However, the pleadings do not allege such a contract. There is only an allegation of negligence; and, as discussed above, there can be no assessment of the damages by the city in such an action.
For the reasons stated herein, judgment is granted in favor of both defendants.