DISTRICT OF COLUMBIA, a
Municipal Corporation,
Appellant,

v.

AIR FLORIDA, INC., et al.

No. 84–5041.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 15, 1984.

Decided Dec. 28, 1984.

Edward E. Schwab, Asst. Corp. Counsel
for the District of Columbia, Washington,
D.C., with whom John H. Suda, Principal

Deputy Corp. Counsel and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., for the District of Columbia were on the brief, for appellant.

George N. Tompkins, Jr., with whom Cynthia J. Larsen was on the brief, New York City, for appellee.

Before TAMM and EDWARDS, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a claim by the District of Columbia (the "District" or the "city") against Air Florida in connection with the tragic 1982 crash of an Air Florida plane. As a result of the accident, a commercial airline destroyed portions of the 14th Street/Rochambeau Memorial Bridge, and then crash-landed in the Potomac River. The District now seeks to recover from Air Florida the costs of emergency services and cleanup required in the aftermath of the tragedy.

The District Court dismissed the city's suit as failing to state a claim upon which relief could be granted. In this appeal, the District contends that its complaint alleged facts sufficient to support recovery on two separate legal theories. First, the city maintains here, as it did below, that a municipality may recover the costs of "extraordinary" emergency services from negligent tortfeasors. Second, the District presents for the first time on appeal the novel theory that Congress has implicitly delegated the United States' alleged public trust responsibilities for the Potomac River to the District and that, consequently, under the common-law public trust doctrine, Air Florida owed the city a duty of care regarding the river which was breached by the crash.

We affirm the judgment of the District Court. The question whether a governmental entity may recover the costs of tax-supported emergency services from negligent tortfeasors appears to be one of first impression in the District of Columbia. Precedent from other jurisdictions, however, persuades us that, in the absence of authorizing legislation or a governmental proprietary interest protected by the services, these expenses may not be recovered from tortfeasors.

 We decline to consider in this case whether the public trust doctrine provides a basis for Air Florida's liability. The District neither made any allegations in its complaint that it was surrogate trustee for the Potomac or that the public trust doctrine was in any way implicated in this case, nor did it raise this theory in its memoranda or arguments before the District Court. While a complaint should not be dismissed unless the court determines that the allegations do not support relief on any legal theory, the complaint nonetheless must set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted. The appellant's public trust theory is a novel one. It was not presented to the District Court and the trial judge surely had no obligation to create, unaided by the plaintiff, a new legal theory in order to support the city's complaint.

We believe that dismissal for failure to state a claim was appropriate and regard the District's public trust argument as a new theory advanced for the first time on appeal. Although appellate courts retain the discretion to entertain new theories, the usual rule is that such theories will not be heard except in exceptional cases. We find no circumstances in this case justifying departure from the normal rule. Our decision not to consider the District's public trust claim is reinforced by our belief that the argument that public trust duties pertain to federal navigable waters, such as the section of the Potomac River at issue here, raises a number of very difficult issues concerning the rights and obligations of the United States (which is not a party here), the creation of federal common law, and the delegation of trust duties to the District. We would prefer to have the benefit of a complete trial record, including

the District Court's thinking on these questions, before reaching such novel issues on appeal; we therefore leave the resolution of these issues to another day and another case.

## I. BACKGROUND

On January 13, 1982, a passenger jet operated by Air Florida took off from Washington National Airport in a heavy snowstorm. Shortly after leaving the runway, the plane struck the Rochambeau Bridge and then plunged into the Potomac. Seventy-eight people, including some on the bridge, were killed in the accident. The District of Columbia incurred significant expenses, allegedly in excess of three-quarters of a million dollars, in rescuing survivors, recovering bodies of the deceased, and raising the airplane and its contents from the river.[1]

The District initially sued to recover these emergency and cleanup expenses in the Superior Court of the District of Columbia; however, on Air Florida's motion, this action was removed to the District Court under 28 U.S.C. § 1441(a). In its complaint, the city alleged that it had incurred extraordinary expenses as a result of Air Florida's negligence. The appellee moved to dismiss this claim under Fed.R. Civ.P. 12(b)(6). In support of its motion, Air Florida argued that it had no duty of due care to protect the District from the expense of providing emergency services and that the costs of public services are not recoverable in a negligence action. The District Court agreed and dismissed this claim, holding that absent either a statute specifically authorizing recovery or a governmental proprietary interest protected by the services, public funds expended in the "performance of governmental functions such as the emergency service provided by plaintiff following the crash ... are not recoverable in tort." [2]

## II. ANALYSIS

### A. *Rational Cost Allocation Theory*

The District contends that it is entitled to recover the costs of rescue and cleanup from Air Florida under a tort theory of rational cost allocation. Because the costs of emergency services occasioned by air disasters are quite high, the city urges that considerations of economic efficiency and equity require that these costs be allocated to the airline industry and its passengers, rather than to those distressed municipalities fortuitously located in the paths of crashes.[3]

The question whether a municipality may recover the cost of police and other emergency services from a tortfeasor is governed by local law. Because this issue apparently has never been decided by District of Columbia courts, we look to other jurisdictions for assistance in determining how the District's courts would rule, were they to face this question.[4]

---

1. The District also sustained physical damage to the bridge. The parties have settled the District's claim relating to bridge repairs.

2. *District of Columbia v. Air Florida, Inc.*, No. 82–2506 (D.D.C. July 14, 1983) (order granting motion for partial dismissal). On December 13, 1983, the District Court issued a final judgment dismissing the entire suit.

3. The District's argument that risks should be imposed on the party who can avoid them most economically or pass the costs on most efficiently is best known through the works of Professors Calabresi and Coase. *See, e.g.,* G. CALABRESI, THE COST OF ACCIDENTS (1970); Coase, *The Problem of Social Cost*, 3 J. LAW & ECON. 1 (1960).

4. *See, e.g., Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (recognizing that in answering local law questions of first impression a federal court must "estimate" what local courts would do); *Brastex Corp. v. Allen Intern, Inc.*, 702 F.2d 326, 330 (2d Cir.1983) (where local law is unclear or non-existent as to the matter in controversy, the federal court must determine what result the local court would reach were the question presented to it); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983) (looking to other jurisdictions for guidance in determining how a local court would decide whether a city may recover extraordinary emergency expenses from negligent tortfeasors where local court had not yet addressed the question).

The general common-law rule in force in other jurisdictions provides that, absent authorizing legislation, "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service."[5] We think that the Ninth Circuit, in *City of Flagstaff v. Atchison, Topeka and Santa Fe Railway Co.*,[6] has offered a persuasive rationale for this common-law rule, and we adopt both their reasoning[7] and the rule here. Where emergency services are provided by the government and the costs are spread by taxes, the tortfeasor does not anticipate a demand for reimbursement. Although settled expectations must sometimes be disregarded when new tort doctrines are needed to remedy an inequitable allocation of risks and costs, where a generally fair system for spreading the costs of accidents is already in effect—as it is here through assessing taxpayers the expense of emergency services—we do not find the argument for judicial adjustment of liabilities to be compelling.

We are especially reluctant to reallocate risks where a governmental entity is the injured party. It is critically important to recognize that the government's decision to provide tax-supported services is a legislative policy determination. It is not the place of the courts to modify such decisions. Furthermore, it is within the power of the government to protect itself from extraordinary emergency expenses by passing statutes or regulations that permit recovery from negligent parties.[8] In other words, the city clearly has recourse to legislative initiative to eliminate or reduce the economic burdens of accidents such as the Air Florida crash.

Exceptions to this general common-law rule have been made where the government incurs expenses to protect its own property.[9] We need not consider the propriety of this exception, however, because the District was not acting to protect its property in providing services after the Air Florida crash. Consequently, we hold that the District Court correctly dismissed the District's claim for reimbursement of expenses associated with emergency services.

## B. *The Public Trust Doctrine Theory*

The District has attempted to overturn the judgment of the District Court by advancing a new legal theory on appeal. While, as the city acknowledges, the United States holds title to the section of the Potomac at issue,[10] and must therefore be the sovereign trustee, the District contends

5. *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d at 323; *see also In Re TMI Litigation Governmental Entities Claim*, 544 F.Supp. 853, 855 (M.D.Pa.1982), *aff'd in part, vacated and remanded in part sub nom. Pennsylvania v. General Pub. Utilities*, 710 F.2d 117 (3rd Cir.1983) (summary judgment not appropriate where there is disputed factual question whether "nuclear incidents" present a unique type of hazard); *People v. Wilson*, 240 Cal.App.2d 574, 576, 49 Cal.Rptr. 792 (1966); *Town of Freetown v. New Bedford Wholesale Tire*, 384 Mass. 60, 423 N.E.2d 997, 997–98 (1981); *City of Bridgeton v. B.P. Oil, Inc.*, 146 N.J.Super. 169, 369 A.2d 49, 54 (1976); *Koch v. Consolidated Edison Co.*, 62 N.Y.2d 548, 479 N.Y.S.2d 163, 468 N.E.2d 1, 7–8 (1984).

6. 719 F.2d 322 (1983).

7. *Id.* at 323–24.

8. *See, e.g., Wilson*, 240 Cal.App. 574, 49 Cal.Rptr. 792 (California statute authorizing recovery of firefighting costs); *United States v. Chesapeake & Ohio Ry. Co.*, 130 F.2d 308 (4th Cir.1942) (Virginia statute authorizing recovery of firefighting costs).

9. *See, e.g., United States v. Denver & Rio Grande Western Ry. Co.*, 547 F.2d 1101 (10th Cir.1977); *United States v. Morehart*, 449 F.2d 1283 (9th Cir.1971); *United States v. Chesapeake & Ohio Ry.*, 139 F.2d 632 (1944).

10. *See, e.g., United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 354, 53 S.Ct. 614, 615, 77 L.Ed. 1250 (1933) (title to and sovereignty over the portion of the Potomac River which lies within the boundaries of the District of Columbia vested in the United States by cession from the State of Maryland); D.C.Code Ann. § 1–101(a) (1981) ("The District of Columbia is that portion of the territory of the United States ceded by the State of Maryland for the permanent seat of government of the United States, including the river Potomac in its course through the District ...").

that Congress has implicitly delegated to it the United States' public trust responsibilities for the river [11] and that, as surrogate trustee, it is obliged to keep the river free from impediments to navigation and from impurities. This responsibility, the District maintains, forms the basis of a duty of care on the part of Air Florida not to interfere with the city's trust obligations, and permits the city to recover cleanup costs which resulted from the breach of that duty—the allegedly negligent crash of Air Florida's plane into the river.

The District did not put forward this theory below. Nor did it allege facts in its complaint or memoranda that would have alerted the District Court to the relevance of the public trust doctrine to this action.

**11.** The District argues that Congress delegated public trust responsibilities regarding the Potomac to the city by conferring on the District significant authority over the river. As an example, it cites D.C.Code Ann. § 22–1701 to 1703a (1981), which gives the District the power to· promulgate and enforce harbor regulations. The city also notes that it provides the only police, fire and sanitation services to the area in question, and that it generally exercises the same type of control over the Potomac that a state would over navigable waters within its boundaries.

**12.** There is absolutely nothing in the city's complaint even to suggest a reliance on a public trust doctrine. Our review of the record reveals only two oblique references by the District to its "obligation" to remove crash debris from the Potomac because it constituted an impediment to navigation. In its Memorandum Regarding the Recovery Against Negligent Tortfeasors For Public Expenditures Made in the Performance of Governmental Functions, the District observed without elaboration, in a footnote explaining that the Comptroller of the National Transportation Safety Board ("NTSB") had refuted Air Florida's protestation that the NTSB is responsible for the costs of airplane wreckage removal, that "[i]rrespective of any interest the NTSB may have had in examining the wreckage, the District was obligated to expeditiously remove foreign materials which constituted a navigation problem in its waters." Record Document No. 13, at 2, n. 1.

An even less direct reference to the navigation problem is found in Plaintiff's Opposition to Motion of Defendant Air Florida, Inc., For An Order Partially Dismissing the Complaint, Record Document No. 15, at 1–2. There the District argued:

For example, the city made no allegations that the United States has common-law public trust duties concerning the Potomac River and that Congress delegated these responsibilities to the District. Indeed, the concept of "public trust" was never even mentioned to the District Court.[12]

Before a complaint may be dismissed for failure to state a claim, a court must determine that the allegations do not support relief on any possible theory;[13] nonetheless, in order to survive a motion to dismiss, the complaint must set forth sufficient information to suggest that there exists *some* recognized legal theory upon which relief may be granted.[14] The District Court has no obligation to create, unaided by the plaintiff, new legal theories to

It is undisputed that as a result of defendant's negligent operation of Flight 90, the District sustained actual damage to its real and personal property. The 14th Street Bridge was extensively damaged. Personal property, such as the District's Fire boat and harbor cruisers, were extensively damaged. Further, defendant's wreckage fell into the Potomac river on the District of Columbia's side creating a navigation problem as well as threatened damage from an oil spill. Thus, the District's claim seeks recovery for the costs expended in relation to protection of its property. (footnote omitted)

We find these passing references to the District's "obligation" to remove impediments to navigation wholly inadequate to alert a court that the public trust doctrine might be implicated.

**13.** *See Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1375, n. 5 (10th Cir.1979); *Bramlet v. Wilson,* 495 F.2d 714, 716 (8th Cir. 1974); 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 601–02 (1969).

**14.** *See, e.g.,* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 602; *see also In Re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981) (despite liberality of modern pleading rules, in order to resist a motion for summary judgment a complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain a recovery under *some* viable legal theory), *cert. granted sub nom. Weyerhaeuser Co. v. Lyman Lamb Co.,* 456 U.S. 971, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982), *cert. dismissed,* —— U.S. ——, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983).

support a complaint.[15] As we explain more fully below, the District's use of the public trust doctrine to furnish a basis for Air Florida's liability is novel enough that, even under the requisite liberal reading of the complaint,[16] a court could not, without the plaintiff's direct reference to the doctrine, reasonably be expected to consider its application to this case.

At the core of the public trust doctrine is the principle that navigable waters are held by the sovereign in trust for certain public uses. The American version of the doctrine, whose ancient roots meander circuitously back to Rome through England,[17] was shaped by our colonial past. Judicial exegesis on the doctrine teaches that while the English sovereign held title to and had dominion over tidewaters and the soil under them, his use of these waters and lands was circumscribed by the public's paramount interests in navigation, commerce and fishing.[18] Title to American tidewaters[19] and their beds passed from the Crown to the Colonies, and after the Revolution vested in the newly sovereign states,[20] to be held in trust for the citizens of these states for the same public uses.[21] Through the Constitution, the original states granted the federal government the right to regulate interstate and foreign commerce,[22] thereby giving Congress an expansive right to ensure the navigability of waterways,[23] but the states reserved title to the beds of their navigable waters.[24] Under the equal footing doctrine, as a general principle, new states took title to and trusteeship for the lands under the navigable waters within their borders as an incident of sovereignty upon admission to the Union.[25]

In this country the public trust doctrine has developed almost exclusively as a matter of state law. Traditionally, the doctrine has functioned as a constraint on states' ability to alienate public trust lands[26] and

---

**15.** *See, e.g., Clark v. National Travelers Life Ins. Co.,* 518 F.2d 1167, 1169 (6th Cir.1975); *Case v. State Farm Mut. Auto. Ins. Co.,* 294 F.2d 676, 678 (5th Cir.1961).

**16.** For the purposes of a motion to dismiss, a complaint is to be construed liberally in favor of the plaintiff. *See, e.g., Jenkins v. McKeithen,* 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1848–1849, 23 L.Ed.2d 404 (1969) (citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Shear v. National Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979). The complaint should not be dismissed unless it appears that the plaintiff could prove no facts in support of his claim which would entitle him to relief. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974), *Jenkins,* 395 U.S. at 422, 89 S.Ct. at 1849.

**17.** *See, e.g., National Audubon Soc'y v. Superior Court,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 718, *cert. denied sub nom. Los Angeles Dep't of Water & Power v. National Audubon Soc'y,* —— U.S. ——, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). See also Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right,* 14 U.D.C.L.Rev. 195 (1980) for a concise description of the evolution of the doctrine.

**18.** *See, e.g., Shively v. Bowlby,* 152 U.S. 1, 11, 14 S.Ct. 548, 551, 38 L.Ed. 331 (1894).

**19.** In *Barney v. Keokuk,* the Supreme Court extended the doctrine to waters which are nontidal, but nonetheless navigable. 94 U.S. (4 Otto) 324, 338, 24 L.Ed. 224 (1877).

**20.** *Shively,* 152 U.S. at 48–49, 14 S.Ct. at 566.

**21.** *Illinois Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 457–58, 13 S.Ct. 110, 119–20, 36 L.Ed. 1018 (1892).

**22.** U.S. Const. art. I, § 8, cl. 3.

**23.** *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 173, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979).

**24.** *See, e.g., Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 373, 97 S.Ct. 582, 588, 50 L.Ed.2d 550 (1977) (quoting *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 229, 11 L.Ed. 565 (1845)) ("The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively.").

**25.** *See, e.g., Montana v. United States,* 450 U.S. 544, 551–52, 101 S.Ct. 1245, 1251–52, 67 L.Ed.2d 493 (1981); *Corvallis Sand & Gravel Co.,* 429 U.S. at 373–74, 97 S.Ct. at 588–89; *Utah v. United States,* 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971); *Shively,* 152 U.S. at 49–50, 14 S.Ct. at 566–567; *Pollard's Leesee,* 44 U.S. (3 How.) at 222–223, 228–230.

**26.** *See, e.g., Illinois Cent. R.R.,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (holding a state may not

as a limitation on uses that interfere with trust purposes.[27] More recently, courts and commentators have found in the doctrine a dynamic common-law principle flexible enough to meet diverse modern needs.[28] The doctrine has been expanded to protect additional water-related uses such as swimming and similar recreation,[29] aesthetic enjoyment of rivers and lakes,[30] and preservation of flora and fauna indigenous to public trust lands.[31] It has evolved from a primarily negative restraint on states' ability to alienate trust lands into a source of positive state duties. As the California Supreme Court observed, "the public trust ... is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands...."[32]

There has, however, been no parallel development of the doctrine as it pertains to federally-owned waterbeds, such as the portion of the Potomac at issue here. To our knowledge, neither the Supreme Court nor the federal courts of appeals have expressly decided whether public trust duties apply to the United States.[33] There appear to be only two district court cases which explicitly hold that this common-law rule applies to the federal government as well as to the states. In *In Re Steuart Transportation Co.*,[34] the District Court for the Eastern District of Virginia upheld, with virtually no analysis, the rights of both the federal and state governments to sue the owner of an oil transport vessel for injury to migratory wildfowl on the theory that "[u]nder the public trust doctrine, the State of Virginia and the United States have the right and duty to protect and preserve the public's interest in natural wildlife resources."[35] The District Court for the Dis-

abdicate its obligation to exercise its police power over trust lands by making an absolute grant of most of the waterfront of a major city to a private party); *People ex rel. Webb v. California Fish Co.*, 166 Cal. 576, 138 P. 79 (1913) (holding that private grantees of public trust land take title subject to the public right of navigation); *Gould v. Greylock Reservation Comm'n*, 350 Mass. 410, 215 N.E.2d 114 (1966) (holding that a legislature must clearly indicate its intention to alienate public trust resources before courts will uphold such alienation).

27. *See, e.g., Marks v. Whitney*, 6 Cal.3d 251, 98 Cal.Rptr. 790, 491 P.2d 374 (1971) (holding that a patentee of tidelands has no right to fill and develop his trust land property in a way that interferes with the public's rights in those lands).

28. *See, e.g.*, Johnson, *Public Trust Protection for Stream Flows and Lake Levels*, 14 U.C.D.L.Rev. 233 (1980); Sax, *Liberating the Public Trust Doctrine from its Historical Shackles*, 14 U.C.D.L. Rev. 185 (1980); Stevens, *supra* note 17; Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C.D.L.Rev. 269 (1980); Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471 (1970).

29. *See, e.g., Marks v. Whitney*, 98 Cal.Rptr. at 796, 491 P.2d at 380; *Matthews v. Bay Head Improvement Ass'n*, 95 N.J. 306, 471 A.2d 355, 363, *cert. denied*, — U.S. —, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Borough of Neptune City v. Borough of Avon-by-the-Sea*, 61 N.J. 296, 294 A.2d 47, 53 (1972).

30. *See, e.g., National Audubon Soc'y*, 189 Cal. Rptr. at 356, 658 P.2d at 719.

31. *See, e.g., National Audubon Soc'y*, 189 Cal. Rptr. at 356, 658 P.2d at 719; *Marks v. Whitney*, 98 Cal.Rptr. at 796, 491 P.2d at 380.

32. *National Audubon Soc'y*, 189 Cal.Rptr. at 360, 658 P.2d at 724.

33. *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), may be read to suggest that the United States was bound by the classic public trust doctrine in dealing with beds of navigable waters before statehood. However, as Professor Wilkinson has pointed out, because "[n]o case has struck down a federal transfer of lands under navigable waterways before statehood ... there is no *holding* that the classic public trust doctrine applied to the United States." Wilkinson, *supra* note 28 at 301 n. 146 (emphasis added).

34. 495 F.Supp. 38 (E.D.Va.1980).

35. *Id.* at 40. *See also Maine v. M/V Tamano*, 357 F.Supp. 1097 (D.C.Me.1973) (holding that *state* may sue for injury to its water and wildlife under a *parens patriae* theory); *Maryland Dep't of Natural Resources v. Amerada Hess*, 350 F.Supp. 1060 (D.Md.1972) (holding that, as trustee of its waters, *state* may sue for injury to its water quality resulting from an oil spill); *cf. Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 671 (1st Cir.1980) (declining to decide whether the public trust doctrine permits trustee to sue for damages to public natural resources where

trict of Massachusetts also has found that at least one aspect of the public trust doctrine applies to the United States. In *United States v. 1.58 Acres of Land*,[36] the court held that the United States could condemn state public trust property and hold such property in fee simple, but noted in *dictum* that the federal government is as restricted as are states in its ability to abdicate its sovereign responsibilities for public trust land to private individuals.[37]

Moreover, no case known to us has held that the public trust doctrine permits a governmental entity, either state or federal, to recover from a negligent tortfeasor the cost of removing a substantial impediment to navigation, such as the Air Florida plane, from navigable waters.

■ We emphasize that we imply no opinion regarding either the applicability of the public trust doctrine to the federal government or the appropriateness of using the doctrine to afford trustees a means for recovering from tortfeasors the cost of restoring public waters to their pre-injury condition. Our point is simply that, given the paucity of relevant precedent and the lack of pleadings referring to the doctrine, the District Court could not have been expected to ponder *sua sponte:* 1) whether common-law public trust duties apply to the federal government; 2) whether these duties regarding the Potomac have been implicitly delegated by Congress to the District; and 3) whether the public trust doc-

trine provides a trustee in the District's position with a basis for recovery. Consequently we cannot hold that the District Court erred in dismissing the District's complaint for failure to state a claim. We therefore affirm the District Court's dismissal and treat the District's public trust argument as a new issue raised for the first time on appeal.

■ It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.[38] As noted by the Supreme Court, the reasons for this rule are clear:

[O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.[39]

Decisions in this Circuit have consistently followed a practice of dismissing appeals brought on grounds not asserted in the trial court:

This is not a mere technicality but is of substance in the administration of the business of the courts. Enormous confusion and interminable delay would result

recovery on statutory grounds was possible), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981).

**36.** 523 F.Supp. 120 (D.Mass.1981).

**37.** *Id.* at 124–25. *See also Sierra Club v. Department of Interior*, 424 F.Supp. 172 (N.D.Cal. 1976); *Sierra Club v. Department of Interior*, 398 F.Supp. 284 (N.D.Cal.1975); *Sierra Club v. Department of Interior*, 376 F.Supp. 90 (N.D.Cal. 1974) (all finding that the National Park System Act, 16 U.S.C. § 1, imposed general trust responsibilities for public lands, analogous to those that states have recognized in relationship to navigable waters, on the Secretary of the Interior); *cf. Sierra Club v. Andrus*, 487 F.Supp. 443 (D.D.C.1980) (holding that the Secretary of the Interior has only statutory, not common-law,

trust responsibilities for public lands). See generally Wilkinson, *supra* note 28, for a discussion of the applicability of common-law public trust notions to federally owned public lands.

**38.** *See, e.g., Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Doe v. McMillan*, 459 F.2d 1304, 1311 n. 10 (D.C.Cir. 1972), *aff'd in part, rev'd in part*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Pardo v. Wilson Line of Washington, Inc.*, 414 F.2d 1145, 1150 (D.C.Cir.1969); *Miller v. Avirom*, 384 F.2d 319, 322 (D.C.Cir.1967); *Stouper v. Jones*, 284 F.2d 240, 243 (D.C.Cir.1960); *Euresti v. Washington Terminal Co.*, 280 F.2d 629, 630 (D.C.Cir. 1960).

**39.** *Hormel v. Helvering*, 312 US. at 556, 61 S.Ct. at 721.

if counsel were permitted to appeal upon points not presented to the court below. Almost every case would in effect be tried twice under any such practice. While the rule may work hardship in individual cases, it is necessary that its integrity be preserved.[40]

Although in exceptional circumstances, where injustice might otherwise result, we have the discretion to consider questions of law that were neither raised below nor passed upon by the District Court,[41] we do not believe that this case warrants departure from the normal rule.

Our decision not to consider the District's public trust claim is reinforced by our belief that the argument that public trust duties pertain to federal navigable waters, such as the Potomac River, presents a number of complex issues which should first be developed in the District Court. Although the parties assumed in their briefs and oral arguments that local, *i.e.*, District of Columbia, law governs the public trust responsibilities in question here, we believe that federal law controls. Before a court proceeds to ask whether the District is in fact the delegated trustee for the river, or whether the public trust doctrine provides a basis for the duty of care asserted by the District, it must determine whether the public trust duties that have been recognized under state law as pertaining to state governments also apply to the federal government when it holds title to the shores and bed of a navigable river. The District's interest in the public trust doctrine here does not exist independently of its status as representative of the United States' interests. When the issue is framed in this manner, it is clear that at

the outset the court must decide the rights and duties of the United States as sovereign titleholder and trustee. As the Supreme Court noted in *Texas Industries, Inc. v. Radcliff Materials, Inc.*, "our federal system does not permit ... contro-vers[ies] to be resolved under state law ... [when] the authority and duties of the United States as sovereign are intimately involved ...." [42]

Essentially, then, the District asks us to create new federal common law regarding the rights and responsibilities of the United States and its delegates. This description of the claim points to three very serious problems with our entertaining this issue on appeal without prior consideration by the trial court. First, the United States is not a party to this action. Because a judicial determination here that the United States has common-law public trust responsibilities for the Potomac could be precedent for future suits involving other federally-owned beds and shores of navigable waters, we think that resolution of this issue should be left for a case in which the District Court has the opportunity to consider whether the United States should be joined.

Second, we think that there is an issue whether Congress has preempted some or all of the field which a *federal* common-law public trust doctrine would occupy.[43] The role of federal common law is very narrow and is " 'subject to the paramount authority of Congress.' " [44] Where a congressional scheme speaks directly to a question which would otherwise be answered by federal common law, federal legislation "preempts" federal common law.[45] Con-

---

**40.** *Johnston v. Reily,* 160 F.2d 249, 250 (D.C.Cir. 1947) (also quoted in *Doe v. McMillan,* 459 F.2d at 1311 n. 10).

**41.** *See, e.g., Hormel v. Helvering,* 312 U.S. at 557, 61 S.Ct. at 721; *Doe v. McMillan,* 459 F.2d at 1311 n. 10; *Stouper v. Jones,* 284 F.2d at 243–44 (Bazelon, J., concurring).

**42.** 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

**43.** Our concern here is confined to the possible displacement of *federal* common law by federal

statutes, and in no way implies a similar concern regarding federal preemption of state public trust law.

**44.** *Milwaukee v. Illinois (Milwaukee II),* 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981) (quoting *New Jersey v. New York,* 283 U.S. 336, 348, 51 S.Ct. 478, 481, 75 L.Ed. 1104 (1931)).

**45.** *Id.*

gress has legislated extensively with regard to many of the interests which the public trust doctrine protects [46]—such as navigation, *see, e.g.,* Rivers and Harbors Appropriations Act of 1899, 30 Stat. 1151 *et seq., as amended,* 33 U.S.C. §§ 401 *et seq.* (1982); fishing, *see, e.g.,* Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661–66c (1982), and recreational use of waters, *see, e.g.,* Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 *et seq.* (1982). Whether such broad statutes addressing public trust concerns expand to fill the field, thus preempting any alleged federal common-law duties, is a complex question which deserves to be considered in a case where the parties have had a full opportunity to present testimony and arguments, and the District Court has had occasion to pass on, the question.

Finally, the question remains whether Congress intended to delegate to the District the federal government's public trust responsibilities for the Potomac. This is a mixed question of fact and law, which would also be facilitated by preliminary District Court consideration.

### III. Conclusion

We affirm the District Court's dismissal for failure to state a claim. The District's public trust argument must await another day and another case for resolution.

*Affirmed.*

---

**46.** See generally Title 16 of the United States Code, which codifies many pieces of natural resource-related legislation addressing public trust interests.