**In re KOREAN AIR LINES DISASTER OF SEPTEMBER 1, 1983.**

**Appeal of Plaintiff's Steering Committee.**

**No. 85–5982.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1987.

Decided Sept. 25, 1987.

D.H. Ginsburg, Circuit Judge, filed concurring opinion in which Williams, Circuit Judge, joined.

---

Milton G. Sincoff, New York City, with whom Donald W. Madole, Washington, D.C., and Steven R. Pounian, New York City, were on the brief for appellant.

George N. Tompkins, Jr., New York City, for appellee.

Before RUTH B. GINSBURG, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH B. GINSBURG.

Concurring opinion filed by Circuit Judge D.H. GINSBURG, in which Circuit Judge WILLIAMS joins.

RUTH BADER GINSBURG, Circuit Judge:

This case arises out of an air disaster and raises turbulent federal questions. On September 1, 1983, Korean Air Lines (KAL) Flight 007, a commercial craft departing from Kennedy Airport in New York and bound for Seoul, South Korea, was destroyed over the Sea of Japan by Soviet Union military aircraft. Wrongful death actions were filed against KAL in several federal district courts; the Judicial Panel on Multidistrict Litigation transferred these actions to the District Court for the District of Columbia for pretrial proceedings pursuant to 28 U.S.C. § 1407 ("[C]ivil actions involving one or more common questions of fact ... pending in different districts ... may be transferred to any district for coordinated or consolidated pretrial proceedings.").

The nub of the controversy relates to the per passenger damage limitation of the Warsaw Convention,[1] raised to $75,000 by an accord among airlines known as the Montreal Agreement.[2] By motion for partial summary judgment, plaintiffs sought a declaration "that [KAL] is liable without fault for compensatory damages without any limitation of $75,000." Joint Appendix (J.A.) at 26. Plaintiffs grounded this motion on the inadequate type size of the liability limitation notice printed on KAL passenger tickets. The notice appeared in 8 point type; the Montreal Agreement specifies 10 point type. Denying plaintiffs' motion, the district court, on July 25, 1985, held that KAL could avail itself of the $75,000 per passenger limitation. *In re Korean Air Lines Disaster of September 1, 1983*, 664 F.Supp. 1463, 19 Av.L.Rep. (CCH) 17,584 (D.D.C.1985). In so ruling, the district court considered and rejected contrary Second Circuit precedent: *In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980*, 705 F.2d 85 (2d Cir.), *cert. denied*, 464 U.S. 845, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983).

On September 24, 1985, the district court certified for interlocutory appeal under 28 U.S.C. § 1292(b) the question whether KAL "is entitled to avail itself of the limitation of damages provided by the Warsaw Convention and Montreal Agreement despite its defective tickets." We ruled that the requirements of section 1292(b) were met and that "wise exercise of our discretion dictates that the appeal be allowed." D.C. Cir. Order filed April 8, 1986.

On January 30, 1987, after argument of the appeal, we remanded the record for clarification of the scope of the district court's order denying plaintiffs' partial summary judgment motion. Specifically,

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* 49 U.S.C. § 1502 note (1982).

2. Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, CAB Agreement 18900, 31 FED.REG. 7302 (1966) (approved by CAB Order E–23680, May 13, 1966).

we observed that the cases consolidated in this appeal

> can be grouped into three categories on the basis of the fora in which they were originally filed and to which they are to be remanded at or before the conclusion of pretrial proceedings, unless the actions are earlier terminated: (a) the Southern and Eastern Districts of New York; (b) the Eastern District of Michigan and the District of Massachusetts; and (c) the District of Columbia. The district judge, in his order denying plaintiffs' motion for partial summary judgment, did not expressly consider the contention that, by analogy to the principle set forth in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), he was bound by Second Circuit precedent in resolving the claims of plaintiffs in the first category enumerated above.

> The extent of a transferee court's authority under 28 U.S.C. § 1407 independently to resolve issues of [federal] law already passed upon by the federal court of appeals for the circuit in which the transferor forum is located is apparently a question of first impression, and our consideration of this issue is hampered by uncertainty as to which plaintiffs were covered by the district court's July 1985 order.

D.C.Cir. Order filed January 30, 1987.

By Memorandum dated May 7, 1987, 664 F.Supp. 1488, the district court held that its July 25, 1985 decision denying plaintiffs' partial summary judgment motion applies to all three categories of cases described in this court's January 30, 1987 remand-for-clarification order. We now affirm the district court's dispositions. On the Warsaw Convention/Montreal Agreement $75,000 per passenger damage limitation issue, we adopt as our opinion the comprehensive July 25, 1985 decision of the district court, reported at 664 F.Supp. 1463. We set out below our reasons for concluding that the district court properly adhered to its own interpretation of the Warsaw Convention/Montreal Agreement in all actions, including those transferred from district courts within the Second Circuit.

---

The Supreme Court, in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), addressed and resolved this question: when a defendant in a diversity action moves for a venue transfer under 28 U.S.C. § 1404(a),[3] which state's law applies post-transfer? The state law that would have applied in the transferor court adheres to the case, the Supreme Court held; in the Court's words, "with respect to state law," the venue change will accomplish "but a change of courtrooms." *Van Dusen*, 376 U.S. at 639, 84 S.Ct. at 821.[4]

The *Van Dusen* interpretation of 28 U.S.C. § 1404(a), as the latter applies in diversity actions, rests on principles advanced in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and cases in the *Erie* line. *Van Dusen*, 376 U.S. at 637–40, 84 S.Ct. at 819–21; *see particularly Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (on issues of state law arising in diversity cases, federal courts must apply choice-of-law rules of states in which they sit). Justice Goldberg explained for the Court in *Van Dusen*:

> [O]ur interpretation [of § 1404(a) ] ... is supported by the policy underlying *Erie*

---

**3.** Under this change of venue prescription, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

**4.** The *Van Dusen* Court expressly did not decide whether the law of the state in which the transferor court sits would apply if plaintiff rather than defendant sought the transfer, or if a state court in the transferor court's state would dismiss the case on forum non conveniens grounds. *Van Dusen*, 376 U.S. at 640, 84 S.Ct. at

821. Wright, Miller & Cooper indicate that several courts have applied the law of the transferor court even when plaintiff, rather than defendant, moves for a transfer. 15 C. WRIGHT, A. MILLER & E. COOPER, *Federal Practice and Procedure* § 3846, at 367 (2d ed. 1986). A strong argument, however, favors application of the law of the transferee state in such instances. *See* ALI, *Study of Division of Jurisdiction Between State and Federal Courts*, § 1306(c) & commentary (1969).

[.] ... [W]e should ensure that the "accident" of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed.... What *Erie* and the cases following it have sought was an identity or uniformity between federal and state courts; and the fact that in most instances this could be achieved by directing federal courts to apply the laws of the States "in which they sit" should not obscure that, in applying the same reasoning to § 1404(a), the critical identity to be maintained is between the federal district court which decides the case and the courts of the State in which the action was filed.

*Van Dusen*, 376 U.S. at 637–39, 84 S.Ct. at 820 (footnotes omitted).

Defendants in *Van Dusen* sought to transfer the case from the Eastern District of Pennsylvania to the District of Massachusetts. (Massachusetts, but not Pennsylvania, limited the damages plaintiffs could recover.) Were the transfer to be made, the Supreme Court ruled, though all further proceedings would take place in the Massachusetts district court, Pennsylvania law, not Massachusetts law, would furnish the governing state prescriptions.

The question before us is whether the *Van Dusen* rule—that the law applicable in the transferor forum attends the trans-

fer—should apply to transferred federal claims. It is a question meriting attention from Higher Authority. Congress, it appears, has not focused on the issue,[5] nor has the Supreme Court addressed it. The Judicial Panel on Multidistrict Litigation assumed, on at least one occasion, that the *Van Dusen* rule would apply to transferred federal claims, *see In re Plumbing Fixtures Litigation*, 342 F.Supp. 756, 758 (J.P.M.D.L.1972),[6] but the Panel, from what we can glean, has given the matter only fleeting consideration.[7] Recognizing that the question is perplexing, particularly in the context of 28 U.S.C. § 1407, a statute authorizing transfers only for pretrial purposes, we are persuaded by thoughtful commentary that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit." Marcus, *Conflict Among Circuits and Transfers Within the Federal Judicial System*, 93 YALE L.J. 677, 721 (1984); *see also* Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation*, 135 U.PA.L.REV. 595, 662–706 (1987).

As the district court stressed in response to our remand, the *Erie* policies served by the *Van Dusen* decision do not figure in the calculus when the law to be applied is federal, not state. Given the reality of conflict among the circuits on the proper interpretation of federal law, however, why

---

**5.** In Senate hearings on the bill that eventually became the multidistrict litigation statute, two witnesses stated that *Van Dusen* would apply to choice-of-law issues under the measure. The experience of those witnesses related to federal claims for antitrust law violations and it may be that they intended their statements to cover such claims. *See Multidistrict Litigation: Hearings on S. 3815 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 89th Cong., 2d Sess. 13, 25 (1966) (statements of Dean Phil Neal and Judge William Becker). The Supreme Court, however, in explicit and repeated qualifications, confined its *Van Dusen* opinion to questions of state law. *See* 376 U.S. at 625–26, 630, 633, 635, 639, 84 S.Ct. at 813–14, 816, 817, 818, 820. The snippet of legislative history just described, therefore, is at best equivocal; the two witnesses perhaps "mean[t] only that *Van Dusen* would apply to state law issues in cases transferred

under the new statute." Marcus, *Conflicts Among Circuits and Transfers Within the Federal Judicial System*, 93 YALE L.J. 677, 710–11 (1984).

**6.** In *Plumbing Fixtures*, a plaintiff resisted § 1407 transfer of his price-fixing claim on the ground that under transferee forum precedent, his standing to sue would be rejected. The Panel stated, with no elaboration: "It is clear [under *Van Dusen*] that the substantive law of the transferor forum will apply after transfer." 342 F.Supp. at 758.

**7.** Several lower courts have also declared, without exposition, that *Van Dusen's* reasoning would apply to transferred federal claim cases. *See* Marcus, *supra* note 5, 93 YALE L.J. at 692–93 & n. 100 (citing cases). Other lower courts have stated that *Van Dusen* does not apply to transferred federal claims. *Id.* at 693 n. 102 (citing cases).

deny to a plaintiff with a federal claim the "venue privilege" a diversity claimant enjoys? Plaintiffs in the *Van Dusen* situation could effectively pick Pennsylvania rather than Massachusetts law and retain the benefit of that choice after transfer. Why deny a similar right of selection and retention to plaintiffs who would fare better under the Second Circuit's interpretation of federal law than under the D.C.Circuit's interpretation?

The point has been cogently made that venue provisions are designed with geographical convenience in mind, and not to "guarantee that the plaintiff will be able to select the law that will govern the case." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 n. 24, 102 S.Ct. 252, 266 n. 24, 70 L.Ed.2d 419 (1981); *see* Marcus, *supra*, 93 YALE L.J. at 696–701. In diversity cases, however, federal courts are governed by *Klaxon* and therefore may not compose federal choice-of-law principles; instead, they must look to state prescriptions in determining which state's law applies. With "no federal choice-of-law principles that favor the application of the law of one state over the law of another," the diversity plaintiff's opening move or "venue privilege" ordinarily fills the gap—it "prevails by default." Marcus, *supra*, 93 YALE L.J. at 700–01. For the adjudication of federal claims, on the other hand, "[t]he federal courts comprise a single system [in which each tribunal endeavors to apply] a single body of law," *H.L. Green Co. v. Mac-Mahon*, 312 F.2d 650, 652 (2d Cir.1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963); there is no compelling reason to allow plaintiff to capture the most favorable interpretation of that law simply and solely by virtue of his or her right to choose the place to open the fray.

As summarized in the commentary we find persuasive:

> The *Van Dusen* Court stressed the venue privilege because [under *Klaxon*] there is no federal principle by which to select the state law that should govern diversity cases. Where federal claims are transferred, however, the principle that the transferee federal court is competent to decide federal issues correctly indicates that the transferee's interpretation should apply.

.   .   .   .   .

> For federal courts, the most significant choice-of-law difference between issues of state law and issues of federal law is that they lack competence to [develop rules of decision for] the former and are presumptively competent to decide the latter. . . . [T]he federal courts have not only the power but the duty to decide [issues of federal law] correctly. There is no room in the federal system of review for rote acceptance of the decision of a court outside the chain of direct review. If a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job.

Marcus, *supra*, 93 YALE L.J. at 679, 702; *see also* Friendly, *The "Law of the Circuit" and All That*, 46 ST. JOHN'S L.REV. 406, 412 (1972) ("I take [*Van Dusen*] to be limited to choices of *state* law.") (emphasis in original).

Application of *Van Dusen* in the matter before us, we emphasize, would not produce uniformity. There would be one interpretation of federal law for the cases initially filed in districts within the Second Circuit, and an opposing interpretation for cases filed elsewhere. Applying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings. Indeed, because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory. Our system contemplates differences between different states' laws; thus a multidistrict judge asked to apply divergent state positions on a point of law would face a coherent, if sometimes difficult, task. But it is logically inconsistent to require one judge to apply simultaneously different and conflicting

interpretations of what is supposed to be a unitary federal law.[8]

The district judge in the instant case observed that

> [i]f ... more than one interpretation of federal law exists, the Supreme Court of the United States can finally determine the issue and restore uniformity in the federal system. The uniformity achieved in this [way] is an "informed uniformity" unlike the "blind uniformity" which would result from one court applying the interpretation of another by rote.

May 7, 1987 D.D.C. Memorandum 664 F.Supp. at 1489. We agree. The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.

We return, finally, to the most anomalous feature of this case. As earlier observed, we deal here not with an "all-purpose" transfer under 28 U.S.C. § 1404(a), but with a transfer under 28 U.S.C. § 1407 "for coordinated or consolidated pretrial proceedings." We have held, in accord with the district court, that the law of a transferor forum on a federal question—here, the law of the Second Circuit—merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit. Should the several cases consolidated for pretrial preparation in the instant proceeding eventually return to transferor courts outside this circuit,[9] would our district court's Warsaw Convention/Montreal Agreement ruling, which we have affirmed, have binding force? We believe it should, as "law of the case," for

if it did not, transfers under 28 U.S.C. § 1407 could be counterproductive, *i.e.*, capable of generating rather than reducing the duplication and protraction Congress sought to check. *See* Steinman, *supra*, 135 U.PA.L.REV. at 664–67, 700–704. On this issue in the case at hand, however, our circuit is not positioned to speak the last word.

———

We affirm the order of the district court that KAL is entitled to avail itself of the limitation on damages provided by the Warsaw Convention and raised to $75,000 by the Montreal Agreement; and we note again that the proper interpretation of the Convention and Agreement, as well as the scope of the transferee court's interpretive authority in a case such as this one, are matters in need of definitive resolution for our national court system.

*Affirmed.*

D.H. GINSBURG, Circuit Judge, concurring in which WILLIAMS, Circuit Judge, joins:

I join in the court's opinion and add some reflections on the "choice of law" problem in the context of a federal claim transferred under 28 U.S.C. § 1407 from courts in various circuits to a court in another circuit. I write separately to emphasize the practical problems inherent in any resolution of this problem under the statute as written, and to surface preliminarily some ameliorative steps open only to Congress.

## I. CONGRESSIONAL INTENT IN SECTION 1407(a)

The problem is simply enough stated. The Second Circuit takes one view of the

---

8. Even if it appears plausible to legal minds to mete out in a consolidated case one version of federal law to plaintiffs whose counsel filed in the Southern or Eastern District of New York, another to plaintiffs whose counsel filed in the District Court for the District of Columbia, it would be difficult to explain the rationality of such divergencies to the lay persons served by the federal judicial system.

9. In practice, it has been reported, most cases transferred under § 1407 are not remanded.

*See* 1986 Ann.Rep.Director Admin.Off.U.S. Courts 128 (as of June 30, 1986, 15,026 actions had been subject to § 1407 proceedings; of those, 10,903 had been terminated by the transferee court); Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation,* 135 U.PA.L. REV. 595, 667 & n. 247, 700 & nn. 410, 411 (1987); Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts, and Transferee Courts,* 78 F.R.D. 575, 583 (1978).

relevant federal law, this court takes another, and still other circuits have not addressed the question. Cases filed in district courts in the Second Circuit, in this circuit, and in other circuits were consolidated in the district court here for pretrial proceedings under § 1407. On a motion for summary judgment as to all the cases, which view of the applicable federal law is the district court to apply to the cases filed outside this circuit? The New York plaintiffs in this case contend that, under *Van Dusen v. Barrack*,[1] the transferee district court must apply the Second Circuit's interpretation to the cases filed originally in that venue. The court rejects that argument because the *Erie* policies underlying *Van Dusen* do not extend beyond the state law context of that case.[2] I agree.

Quite apart from whether *Van Dusen* is controlling, there are some circumstances in which a federal court is bound to apply the decisions of another circuit, but they are the rare instances where a preclusion doctrine so requires. The doctrines of *res judicata*, collateral estoppel, and law of the case come to mind. The New York plaintiffs do not, and cannot, however, rely upon any of these doctrines to support application of *Polish Airlines* to their transferred cases.

Consequently, the New York plaintiffs' suggestion that transfer under section 1407(a) presents the type of exceptional circumstance that justifies imposing upon a federal court the duty to accept as binding another circuit's interpretation of federal law would constitute a novel departure from the norm of independent judgment.

---

**1.** 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

**2.** Opinion of the Court, *supra*, at 1174. Plaintiffs cite several authorities for the proposition that *Van Dusen* requires a transferee court under section 1407 to apply the case law of the transferor circuit to a transferred case. Plaintiffs' Brief at 7. *See Berry Petroleum v. Adams & Peck*, 518 F.2d 402, 408 n. 7 (2d Cir.1975) ("Since this case was brought in a district court in the Fifth Circuit, the substantive law of that circuit is the law we must consider here."); *In re National Student Marketing Litigation*, 517 F.Supp. 1345, 1346 n. 3 (D.D.C.1981); *In re Haven Industries*, 462 F.Supp. 172, 179 (S.D.N.Y. 1978); *Stirling v. Chemical Bank*, 382 F.Supp. 1146, 1150 n. 5 (S.D.N.Y.1974), *aff'd* 516 F.2d 1396 (2d Cir.1975); *In re Four Seasons Securities Laws Litigation*, 370 F.Supp. 219, 228 (W.D.Okl. 1974); *In re Plumbing Fixtures Litigation*, 342 F.Supp. 756, 758 (Jud.Pan.Mult.Lit.1972); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 309 F.Supp. 1053, 1055 (E.D.Pa.1969).

The cursory "analysis" employed in the cases amounts to the following. In *Philadelphia Housing Authority*, the parties did not dispute the proposition, and the court cited *Van Dusen* as authority. The issue was disputed in *Plumbing Fixtures*, but the court relied upon *Van Dusen* and *Philadelphia Housing Authority* without analysis. *National Student Marketing, Four Seasons*, and *Stirling v. Chemical Bank* merely bootstrapped on *Plumbing Fixtures*, while *Haven Industries* cited *Plumbing Fixtures* as well as the Second Circuit's decision in *Berry Petroleum* (the only court of appeals decision favorable to the New York plaintiffs) which itself cited both *Plumbing Fixtures* and *Van Dusen* without dis-

cussion. That these cases fail to acknowledge the differences between the application of state and federal law was also pointed out in *In re Pittsburgh & L.E.R. Co. Securities & Antitrust Litigation*, 543 F.2d 1058, 1065 n. 19 (3rd Cir. 1976), which particularly undermines the value of *Philadelphia Housing Authority* as precedent on this point. *Berry Petroleum* is also questionable because it fails to address two prior decisions of the Second Circuit that are in direct conflict with it. *See H.L. Green Co. v. Mac-Mahon*, 312 F.2d 650 (1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963); *Ackert v. Bryan*, 299 F.2d 65, 69–70 (1962); *see also Clayton v. Warlick*, 232 F.2d 699, 706 (4th Cir.1956); *Scheinbart v. Certain-Teed Products Corp.*, 367 F.Supp. 707 (S.D.N.Y.1973).

Two other cited cases, *In re Air Crash Disaster at Boston, Massachusetts on July 31, 1973*, 399 F.Supp. 1106, 1108 (D.Mass.1975); *In re Air Crash Disaster Near Hanover, New Hampshire*, 314 F.Supp. 62, 63 (Jud.Pan.Mult.Lit.1970), are inapposite here; like *Van Dusen*, they involved the issue of which *state* law to apply. *See also In re Nucorp Energy Securities Litigation*, 772 F.2d 1486, 1491–92 (9th Cir.1985); *In re Eastern Airlines, Inc., Engine Failure, Miami International Airport on May 5, 1983*, 629 F.Supp. 307, 315–16 (S.D.Fla.1986). Judge Weigel cited the federal and state law cases together as supporting the proposition that "the transferee court must apply the substantive law of the transferor forum." Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 584 (1978). *See also* Manual for Complex Litigation, Second § 31.-122 at 254 n. 25 (1985) ("The transferee judge is bound ... by the law that would apply in the transferor court, even if the case is later transferred to the transferee court under 28 U.S.C. § 1404").

If Congress had intended such a departure, therefore, we should expect to find language in section 1407(a) that mandates, or at least suggests, it. Obviously, Congress could have directed transferee courts to apply the case law of the transferor court. Less directly, Congress could have suggested this practice by transforming the transferee judge into a temporary judge of each transferor court for the purposes of deciding the transferred cases.[3]

We find no such language in section 1407(a), however.[4] Instead, the transfer scheme contemplates that a transferee court will adjudicate transferred cases no differently than cases originally filed before it. This is apparent throughout the scheme, from the point of transfer to the final disposition of the case. Rather than confine the transferee judge merely to pre-siding over the pretrial phase of cases that may be resolved finally in the transferor courts, section 1407(a) transfers jurisdiction over whole cases to the transferee court; upon transfer, the transferor courts retain no jurisdiction whatsoever.[5] Indeed, Congress contemplated that transferred cases might never return to the transferor courts, but instead might be settled or resolved by summary judgment in the transferee court,[6] or else transferred under section 1404(a) to that same transferee court for joint trial.[7] In practice, the vast majority of transferred cases are so resolved, and do not return to the transferor courts.[8] Finally, during the period of the 1407(a) transfer, any appeals—interlocutory or after summary judgment—go to the court of appeals for the transferee court, not to the courts of appeals for the transferor cir-

---

3. Congress took this type of approach in Section 1407(b) in apparent recognition that transferee judges, because they often preside over cases from far-flung transferor courts, would of necessity have to perform in unfamiliar roles. In section 1407(b), Congress authorized transferee judges to order pretrial depositions outside of their normal jurisdiction. As we determined *In re Corrugated Container Antitrust Litigation,* 662 F.2d 875, 880–881 (D.C.Cir.1981), however, it did so by making the transferee judge, for that purpose, a "temporary judge" of the district court for the district in which the deposition is taken. Congress seemingly could have drafted section 1407(a) also to transform the transferee judge into a judge of each transferor court for purposes of deciding the cases transferred from that court. (Such an approach would still preserve the efficiencies of requiring only one federal judge to become versed in the facts of a controversy.) If Congress also provided for transferor circuit review of such cases, then we might conclude that Congress' intent under such a version of section 1407(a) was for the case law of the transferor court to govern the transferred case.

4. Section 1407(a) was enacted in 1968, and its legislative history indicates that *Van Dusen,* decided four years earlier, would apply in the pretrial context. *See* Opinion for the Court, *supra,* at n. 5. There is no indication, however, that Congress believed that *Van Dusen* extended beyond its own context of federal courts applying state law.

5. *See Glasstech, Inc. v. AB Kyro OY,* 769 F.2d 1574 (Fed.Cir.1985); *Astarte Shipping v. Allied Steel & Export Service,* 767 F.2d 86, 87 (5th Cir.1985); *In re Upjohn Co. Antibiotic Cleocin*

*Products Liability Litigation,* 664 F.2d 114, 118 (6th Cir.1981); *General Elec. Co. v. Byrne,* 611 F.2d 670, 673 (7th Cir.1979); *In re FMC Corp. Patent Litigation,* 422 F.Supp. 1163, 1165 (Jud. Pa.Mult.Lit.1976). *Cf. Starnes v. McGuire,* 512 F.2d 918, 924 (D.C.Cir.1974) (en banc) (transfer under section 1404(a)).

6. *See* Weigel, *supra* note 2, 78 F.R.D. at 582–83; *Pfizer Inc. v. International Rectifier Corp.,* 538 F.2d 180 (8th Cir.), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); *Humphreys v. Tann,* 487 F.2d 666, 668 (6th Cir.1973), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307 (1974); *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir.1973), *cert. denied sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974); *Reidinger v. Trans World Airlines, Inc.,* 463 F.2d 1017, 1018 n. 2 (6th Cir.1972).

7. *See, e.g., In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975,* 479 F.Supp. 1118, 1121–22 (E.D.N.Y.1978), and cases cited; *In re Yarn Processing Patent Validity Litigation,* 472 F.Supp. 174 (S.D.Fla.1979); *In re Antibiotic Actions,* 333 F.Supp. 299 (S.D.N.Y. 1971).

8. *See* Weigel, *supra* note 2, 78 F.R.D. at 583, which reports that less than 5 percent of transferred cases return to the transferor courts. More recent statistics indicate that the number may now approximate 25 percent. *See* 1986 Ann.Rep.Director Admin.Off.U.S.Courts 128; Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation,* 135 U.Pa.L.Rev. 595, 700 (1987).

cuits.[9] I can see no indication, from the outline of this scheme, that Congress intended for transferee courts to apply to each transferred case the case law of the transferor court, nor any reason why it would so intend.

Before concluding, based on the lack of any evidence to the contrary, that Congress did not intend transferee federal courts to depart from the norm of independent judgment on matters of federal law, one final inquiry is necessary. For we should still hesitate to adhere to that norm if doing so would, for some other reason, frustrate the purpose of section 1407(a) "to promote the just and efficient conduct" of multidistrict actions, in part by "eliminat[ing] the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts."[10]

In order to discern whether the norm of independent judgment would have this result, we may assess its operation in the instant case. To recapitulate the procedural facts a bit, cases from district courts in the First, Second, and Sixth Circuits were transferred to the District Court for the District of Columbia for pretrial proceedings to be conducted jointly with cases filed here. Plaintiffs then filed a motion for summary judgment on the issue of damages, arguing that the Warsaw Convention's maximum no-fault liability of $75,000 per passenger was not a bar to full compensatory damages in these actions. When the motion was filed, only the Second Circuit had spoken on the pertinent question, holding in *Polish Airlines*[11] that an airline that does not give passengers tickets with 10–point type loses the protection of the damage ceiling. The other circuits, in particular the District of Columbia, First, and Sixth Circuits, had not yet addressed the issue.[12] Analyzing the Convention for himself, Chief Judge Robinson concluded that *Polish Airlines* was wrongly decided: noncompliance with the "10–point type" rule does not remove the ceiling.

Adhering to the norm of independent judgment, Chief Judge Robinson also determined that his ruling should apply to all of the cases before him, not only to those originally filed here. At least in the first instance, such uniform application of his ruling furthers considerably the efficiency and consistency goals of section 1407(a). All the cases will be governed by one rule as to damages, and they will all proceed in a like direction, rather than being bifurcated into two groups of cases with diverging litigation paths.

The only problem that does seem potentially to arise from this approach involves the eventual appellate review of Chief Judge Robinson's ruling on the Convention. Assuming for the purposes of illustration that interlocutory appeal to this court had not been granted and, furthermore, that the cases would not subsequently terminate for one or another reason in this circuit, then the transferred cases would return to the respective transferor courts for trial. The several courts of appeals, either on interlocutory appeal or on appeal of the final judgment, would in all probability review the course of pretrial proceedings, including Chief Judge Robinson's potential-

**9.** *See Corrugated Container,* 662 F.2d at 88; *Glasstech, Inc. v. AB Kyro OY,* 769 F.2d at 1576–78; *Astarte Shipping v. Allied Steel & Export Service,* 767 F.2d at 880. In a number of other decisions, *see, e.g., Gulf Oil Co. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), as well as the cases cited *supra* note 6, the authority of the transferee circuit to review a transferee district court's order was assumed *sub silentio.*

**10.** *In re Plumbing Fixtures Cases,* 298 F.Supp. 484, 491–92 (Jud.Pan.Mult.Lit.1968).

**11.** *In re Air Crash Disaster at Warsaw Poland,* 705 F.2d 85 (2d Cir.), *cert. denied sub nom. Polskie Linie Lotnicze v. Robles,* 464 U.S. 845,

104 S.Ct. 147, 78 L.Ed.2d 138, *reh. denied,* 464 U.S. 978, 104 S.Ct. 416, 78 L.Ed.2d 353 (1983), *subsequent proceedings,* 748 F.2d 94 (2d Cir. 1984), *on appeal after remand, Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000 (9th Cir.1987).

**12.** Subsequent to the district court's denial of summary judgment in this case, the Fifth Circuit adopted the *Polish Airlines* rule. *See In re Air Crash Near New Orleans, Louisiana,* 789 F.2d 1092, 1098, *vacated,* 795 F.2d 381 (1986), *aff'd in relevant part,* 821 F.2d 1147 (1987) (*en banc*). As the district court's opinion in this case was not then published, however, the Fifth Circuit discussed only the Second Circuit's decision.

ly outcome-determinative ruling on the Convention. Reversal would be most likely to occur, of course, in the Second Circuit, where his ruling would conflict directly with *Polish Airlines.*

Since this court would still review the cases filed in the District of Columbia, and as confirmed by the court today we do not agree with the *Polish Airlines* decision, the results on appeal would lead to two (or depending upon the views of the First and Sixth Circuits, perhaps more) different holdings on a determinative issue of damages.[13] A series of inconsistent appellate judgments is not a desirable outcome, however, particularly since the result in some cases might be to require renewed pretrial or trial proceedings. This whole course of case development, starting with divergent paths of appeal and ending with either conflicting or duplicative results, would clearly frustrate the primary goals of section 1407 (a) "to promote the just and efficient conduct" of multi-district actions.

Having a transferee court apply the norm of independent judgment in ruling on transferred cases, therefore, does pose some risk of undermining on appeal the interests served by section 1407(a). The question is therefore whether this potential risk is great enough to frustrate Congress' remedial intent in enacting section 1407(a), and thereby to persuade us that transferee courts must abandon the norm of indepen-

dent judgment in deciding transferred cases. In this regard, I believe that, although there is some risk of cases unraveling upon review by transferor circuits, it is not significant. First, relatively few cases ever return to the transferor courts.[14] Second, most transferee court rulings will not be outcome-determinative, but instead will involve routine matters, such as discovery orders, that will not provide grounds for a transferor circuit court to reverse a pretrial ruling by the transferee district court.

Third, as to those few outcome-determinative rulings of the transferee district court, there exists the possibility of interlocutory appeal to the transferee circuit, pursuant to 28 U.S.C. 1292(b), as indeed occurred in this case. If the transferee circuit reviews such a ruling, it of course would also exercise independent judgment and apply its own precedents rather than those of the transferor circuits. By reviewing the ruling, the transferee circuit probably will have insured that, if the cases are retransferred to the transferor courts, they will not unravel on later appeal. That is because, in contrast to the rulings of the district court under review, the interlocutory decisions of a coordinate court of appeals are likely to be accepted as binding, under the doctrine of law of the case, in the courts of appeals reviewing the final decision of the district court.[15] I therefore believe that if (1) transferee circuits are

**13.** In other situations, the disputed issue may involve liability.

**14.** *See supra* note 8. Of course, fewer cases would be settled and more would return to their transferor courts if the other circuits show themselves ready to reverse transferee courts' pretrial rulings, thus inviting such encore appearances.

**15.** No decision of this court has directly resolved the question of how courts should apply the law of the case doctrine after a case is transferred back to a transferor court. *See Int'l Union, UAW v. Donovan,* 756 F.2d 162, 165 n. 16 (D.C.Cir.1985); *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1082–83 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985); *McCandless v. Beech Aircraft Corp.,* 697 F.2d 1156 (D.C.Cir.1983). Our precedents do suggest, however, that the transferor circuit should not disturb the transferee circuit ruling. In *Laffey,* we held that the law of the case doctrine precludes—absent clear error or mani-

fest injustice—our reviewing, on appeal from a final judgment, a previous ruling of this court rendered on interlocutory appeal. The next question is whether the fact of transfer, and the resulting lack of identity of the two appellate courts, would alter our conclusion that an interlocutory appellate ruling is law of the case for the purpose of a subsequent appeal. *Donovan* would seem to reject this possibility by holding that, in the context of a transfer for lack of jurisdiction, the transferee court should not reexamine the ruling of a transferor court of *coordinate* jurisdiction absent exceptional circumstances. In fact, this principle has been stated by other circuits. *See Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 657 (Fed.Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1580 (Fed.Cir.1983); *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 169 (3rd Cir.1982); *Skil Corp. v. Millers Falls Co.,* 541 F.2d 554, 558 (6th Cir.), *cert. denied,* 429 U.S. 1029, 97 S.Ct.

receptive to interlocutory appeals involving outcome-determinative rulings by a transferee district court—again, as occurred in this case as well as in *Polish Airlines* [16]; and if (2) transferor circuits are receptive, on appeal after retransfer, to the law of the case as it was decided in the transferee circuit court, then even a continuing disagreement between the transferee and transferor circuits on the certified issue need not cause particular cases in a multidistrict litigation to come unglued.

As a result, any harm to the interests Congress meant to further in section 1407(a) will be limited to those outcome-determinative rulings of a transferee district court that are not the subject of an interlocutory appeal in the transferee circuit, and, assuming that the cases are transferred back to the transferor courts, result in reversals by one or more transferor circuit courts. [17] Whether this harm, which seems likely to be insignificant, is nevertheless great enough that transferee district courts must abandon the norm of independent judgment depends upon the probable effects of the alternative rule, under which the transferee district court would apply what it believes would be the interpretations of the respective transferor courts. [18] Again, the facts of this case are illustrative.

653, 50 L.Ed.2d 631 (1976). *See also Sentner v. Amtrak,* 540 F.Supp. 557, 558–59 n. 3 (D.N.J. 1982); Steinman, *supra note* 8, 135 U.Pa.L.Rev. at 702–03 & n. 417; Weigel, *supra* note 5, 78 F.R.D. at 577.

While a transferor court of appeals might disagree with the transferee circuit's reading of the law, there is good reason in this context to accept a reasoned opinion as presenting something less than the clear error or exceptional circumstance that warrant departing from the law of the case doctrine. Chief Judge Robinson well put the case for transferor courts giving preclusive effect to rulings of a transferee court: "if transferor courts were free to readjudicate issues determined by transferee courts, transfers pursuant to 28 U.S.C. § 1407 could become meaningless exercises perpetuating the very duplication they were designed to eliminate." *In re Korean Air Lines Disaster of September 1, 1983,* 664 F.Supp. at 1489.

*See also In re Multi-Piece Rim Products Liability Litigation,* 653 F.2d 671, 678 (D.C.Cir.1981) ("Proper coordination of complex litigation may be frustrated if other courts do not follow the lead of the transferee court."). *Multi-Piece Rim Products* did not directly address the situation discussed in the text. Instead, it involved whether a pre-transfer order of a transferor district court had preclusive effect, as law of the case, on a transferee district court. *Cf. Blaski v. Hoffman,* 260 F.2d 317, 322 (7th Cir.1958), *aff'd,* 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960) (the transferee Seventh Circuit refused to abide by the "erroneous" jurisdictional ruling of the transferor Fifth Circuit; the Supreme Court adopted the Seventh Circuit's view of the merits; although the law of the case issue was not raised to the Court, in *dictum* it suggested that, because the ruling involved the Seventh Circuit's jurisdiction, it would not be bound by the Fifth Circuit's ruling on that point, 363 U.S. at 340 & n. 9, 80 S.Ct. at 1088 & n. 9); *In re Upjohn Co. Antibiotic Cleocin Products Liability Litigation,* 664 F.Supp. 114, at 118–20 (6th Cir.1981); *In re Long Distance Telecommunication Litigation,* 612 F.Supp. 892, 900–03 (E.D.Mich.1985).

**16.** *Polish Airlines,* 705 F.2d at 86 n. 2 (a second interlocutory appeal followed—*see* 748 F.2d at 94–95). *See Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. at 192, 95 S.Ct. at 397; *In re Western Liquid Asphalt Cases,* 487 F.2d at 192–93; *In re Air Disaster at John F. Kennedy International Airport,* 479 F.Supp. at 1124–29, and cases there cited.

**17.** This harm would be further minimized if transferor circuit courts required, as a condition of reviewing a ruling by the transferee district court, that the appellant at least have sought interlocutory appellate review of that ruling while in the transferee circuit. This rule is comparable to that under which an appellate court will decline to reach an issue not raised before the trial court, *see District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C. Cir.1984), and the institutional interests served are similar. In each instance, the rule requires the litigant to raise an issue at a particular stage in the litigation in order to prevent the litigant from, in effect, confronting the court on appeal with an issue that has not been sorted out by a court of first instance, thereby creating " '[e]normous confusion and interminable delay.' " *Id.* at 1084, *quoting Johnston v. Reily,* 160 F.2d 249, 250 (D.C.Cir.1947). In the transfer context, this suggestion would deprive parties who lose before the transferee district court, and anticipate losing as well before the transferee circuit court, of the incentive to avoid interlocutory appeal and to forestall settlement in the hope of having the case retransferred to the circuit whose more favorable case law renders appellate success more likely.

**18.** If transferor circuit law were applicable, the transferee district court might also remand the case to the respective transferor districts for resolution of an issue. Depending upon the issue and its disposition, retransfer (even after interlocutory appeal in the transferor circuit) might be in order. The cost and delay of proceeding in this manner undercuts, however, Congress' purpose in enacting section 1407.

Under that alternative, Chief Judge Robinson, having determined that KAL's issuance of 8-point type tickets did not remove the limitation on damages provided under the Convention, would then have to determine the scope of his ruling. Certainly it would govern the cases filed in this district originally; no one disputes that proposition. Under the New York plaintiffs' argument, however, the ruling should not govern their cases, because *Polish Airlines* clearly dictates the contrary interpretation of the Convention.

When applied only to the District of Columbia and New York cases, adherence to the case law of the transferor circuit would be a fairly easy procedure for the transferee district court. It is almost a certainty, however, that the bifurcated ruling it produces would place the District of Columbia and New York cases on increasingly divergent courses. The District of Columbia plaintiffs, in conducting discovery, will have to pursue evidence of fault on the part of KAL, whereas the New York plaintiffs would be able to recover without such a showing. The entire course of discovery, and thus the motions that come before Chief Judge Robinson, would differ entirely between what would have become, in effect, two separate groups of consolidated cases. These differences would be further magnified by the vastly different incentives for settlement facing the two groups of plaintiffs. The District of Columbia plaintiffs, having to prove fault, will presumably be more amenable to settlement than would be the New York plaintiffs. All in all, therefore, it is unlikely that the bifurcated ruling would preserve, to any significant extent, either the efficiency or the consistency that section 1407(a) was intended to promote.

Under the New York plaintiffs' rule, therefore, the threat that the Second Circuit would reverse Chief Judge Robinson and thereby unravel the New York cases is averted, in effect, by preemptively unraveling them in the transferee court. This seems to be a high price to pay—a virtual abandonment of the efficiency and consistency goals of section 1407(a)—to protect against a threat, i.e. unraveling in the transferor circuit courts, that could instead be avoided, at no cost to consistency and at a much lower cost in efficiency, through interlocutory appeal to the transferee circuit court and subsequent application by the transferor circuit of the law of the case doctrine.

The price that must be paid in abandoning the norm of independent judgment, however, looms even larger when one realizes that the New York plaintiffs have presented us with the deceptively easy alternative by applying *Polish Airlines* to the New York cases, without suggesting to us how the district judge should have ruled with respect to the cases from districts in the First and Sixth Circuits, which have not decided this issue.[19] In attempting to rule as would a district court in those circuits, he could have simply applied his own ruling to those cases, happy to believe that, if called upon, those circuits would see things his way. Or, taking to heart the New York plaintiffs' contention that, under *Van Dusen*, transfer should result in merely "a change of courtrooms,"[20] he could have seriously attempted to divine how the First and Sixth Circuits might interpret the Convention if called upon to do so.

This enterprise is far more problematic than *Erie*'s familiar requirement that a federal court assume the perspective of the highest court in each transferor state, and anticipate how each one of those courts

---

**19.** We see nothing in section 1407(a) that would justify a transferee court in applying transferor precedent when it is clear, as is *Polish Airlines* in the Second Circuit, but not trying to discern what other transferor circuits would decide when their case law is not as clear on the precise point in question but offers some guidance. Introducing such a distinction would constitute an act of legislation appropriate for Congress, not one of interpretation of the existing statute by a court. Hence, either a transferee court must apply its own interpretation of federal law to all transferred cases, or it must attempt to apply what it believes to be each transferor court's probable interpretation. There is no middle road.

**20.** 376 U.S. at 639, 84 S.Ct. at 821.

would decide an issue of state law. As to some *Erie* issues, the transferor states will have significantly different laws; as to others, such as those addressed by the sundry and not entirely "uniform" codes adopted by the several states, there may be only subtle differences, difficult to discern, among them. Regardless of the difficulty, however, the duty of the transferee court under *Van Dusen* and *Erie* is simply to arrive at what it, in good faith, believes to be an accurate statement of each state's law, as applied to the facts before it. When this results in the transferee court rendering different judgments in cases transferred from different fora, therefore, it is only because the states in question have exercised their undoubted "right to pursue local policies diverging from those of [their] neighbors."[21]

When we turn to questions involving federal law, the transferee judge's task becomes much more difficult, because here the court deals with a single federal law that can ultimately have only one proper interpretation. For example, in the instant case, a violation of the "10–point type" rule cannot both impose *and* not impose unlimited liability under the Warsaw Convention; either the Second Circuit or we have interpreted it erroneously.[22] As a result, any attempt by Chief Judge Robinson to predict how the First and Sixth Circuits would interpret the Warsaw Convention on this precise point would necessitate casuistical musings concerning whether another circuit's case law might be read to compel, or even perhaps just to suggest, an interpretation in conflict with his.[23] Such intellectual practices fall within the domain of the sophist, not that of the judge.

The practice suggested by the New York plaintiffs, therefore, differs qualitatively from accepted instances in which a federal court must apply the ruling of another court. Under the preclusion doctrines of res judicata, collateral estoppel, and the law of the case, a court applies a known ruling of another court—usually to the very facts from which it arose. Under the New York plaintiffs' suggestion, however, the transferee district court will often have to engage in pure guesswork in order to apply another circuit's precedents, if any there be, to the unique facts before it. In this respect, they propose a practice that is unprecedented in the context of federal courts interpreting federal law. Furthermore, when the transferee district court will not be able to rely on a decision on point, there is no assurance, try as it might, that it will always be able correctly to predict how an undecided transferor circuit will eventually decide the kind of close issue over which circuits tend to split. As a result, even though abandonment of the norm of independent judgment appears at first glance to provide a way to prevent cases from unraveling after returning to the transferor courts, the effectiveness of that course might be quite limited, in this case perhaps only to the New York cases.

I have undertaken to assess the implications of applying alternative interpretive models—the exercise of independent judgment versus the application of transferor circuit case law—in order to determine whether, although congressional silence would generally counsel us against doing so, we should nevertheless break with practice by having transferee courts apply transferor circuit case law. Such a break, as I indicated, would be justified only if the

21. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941).

22. Albeit not necessarily "clearly erroneous" for purposes of the law of the case doctrine. *See* note 15, *supra.*

23. *See* Marcus, *Conflicts Among Circuits and Transfers Within the Federal Judicial System,* 93 Yale L.J. 677, 713–14 (1984). For the federal-law transfer situation to be analogous to what occurs under *Van Dusen,* in which the federal

court assumes the perspective of the transferor state's highest court (i.e. of the supreme interpreter of the state's law), the question in the KAL case would *not* be (as the New York plaintiffs suggest it is)—"how would the other federal circuits interpret the Warsaw Convention?" Rather, the analogous question would be the same one that a circuit court normally poses when addressing an issue of federal law—"how would the U.S. Supreme Court (the supreme interpreter of federal law) interpret the Warsaw Convention?"

exercise of independent judgment would frustrate Congress' remedial purposes in enacting section 1407(a). The analysis of these alternatives, however, tends to confirm that we should adhere to existing practice. The purposes of section 1407(a) would more likely be frustrated, not when a transferee district court exercises independent judgment, but rather when it attempts to anticipate the various transferor courts.[24]

Section 1407(a) was enacted "to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts."[25] Under the New York plaintiffs' rule, however, transfer under section 1407(a) will simply yield "conflicting contemporaneous pretrial rulings" by one judge rather than by many. The transferee judge, on the most insignificant as well as outcome-determinative rulings, will have to wonder whether he or she would rule differently if located instead in one of the transferor circuits. No doubt, a considerable amount of the judge's time will be consumed attempting to determine whether litigants accurately describe differences in other circuits' interpretations of federal law. And, if the judge is persuaded that some difference does or *may* exist, it will be no small task to explain the inconsistent and contradictory rulings.

The conduct of multidistrict litigation, which is invariably time consuming as it is, will grind to a standstill while transferee judges read separate briefs, each based on the case law of a transferor circuit, on a single issue of federal law. Much of the advantage that transfer was intended to produce, and particularly the desiderata of furthering efficiency and preventing inconsistent rulings, will be lost by requiring transferee judges to wear a number of judicial hats. It is the prospect of this kind of quagmire that is likely to yield the result feared by the Court in *Van Dusen*—that courts would be "reluctant to grant transfers" and thereby "frustrate the remedial purposes of [section 1407]."[26] It may well be preferable to have multidistrict litigation remain dispersed in the courts of origin than to have transferee judges burdened with the hopelessly complex task of sitting as several federal judges at once.[27] Consequently, even though having transferee judges exercise independent judgment may in isolated instances result in an unraveling of a transferred case, I believe that this approach, although not a perfect solution, is by far the less problematic and the more consistent with the intent of Congress in enacting section 1407.

## II. Beyond Interpretation

Under section 1407(a), cases involving federal law are transferred from one circuit to another, and are conceivably subject to appellate review in several circuits, at various stages in the litigation. Given these facts, any resolution of the problem of whose case law will be applied entails, under the statute as currently written, some cost in efficiency and consistency; losses are truly unavoidable. They may be minimized, however, and that is why I reject the New York plaintiffs' suggestion, which in addition to exacting a much higher cost also requires federal courts, in the absence of any congressional mandate, to depart completely from the accepted norm of independent circuit interpretation.

In order for cases to be transferred from one circuit to another with a minimum loss of efficiency and consistency, the only solution is for Congress to amend section 1407(a), as well as section 1404(a),[28] to pro-

---

**24.** *A fortiori,* when it throws up its hands and remands the cases to the transferor courts for determination of the issue. *See* note 18, *supra.*

**25.** *In re Plumbing Fixtures Cases,* 298 F.Supp. at 491–92.

**26.** *Van Dusen,* 376 U.S. at 636, 84 S.Ct. at 819.

**27.** This is particularly the case insofar as the rule applicable to transferee judges under section 1407(a) is applied as well in the analogous context of a transfer under section 1404(a). The prospect of a trial presided over by a judge expected to simulate different district courts throughout as many as twelve circuits is likely to discourage any court from ordering transfer under section 1404(a).

**28.** *See* note 27, *supra.*

vide that rulings by a court in one circuit will not be reviewed under the case law of another circuit. In this respect, the options seem to be: (1) adopt the New York plaintiffs' position, and have the law of the transferor court govern a transferred case throughout its disposition; (2) provide that a ruling in a transferred case is to be reviewed, by whatever circuit court, under the case law of the circuit in which the ruling was made; and (3) make transfer comprehensive, extending through trial and appeal in the transferee circuit (applying its own circuit precedents, of course). For the reasons I have given, the first option involves considerable costs. Because the transferee court will have to treat cases from different circuits differently, this alternative virtually guarantees the sacrifice of the efficiency and consistency gains that were supposed to result from conducting consolidated pretrial proceedings. Furthermore, it places the transferee district court in the almost impossible position of determining whether courts of appeals in other circuits would disagree in interpreting federal law.

The second option appears to be far more advantageous. Under this scheme, the transferee district court applies its circuit case law—which it knows best—and its own best judgment to all the transferred cases. By treating all the cases similarly, the statutory goals of efficiency and consistency would be immediately furthered. In addition, the risk that these goals would be undermined by a later unraveling of the cases in the transferor courts is substantially lessened. In reviewing a transferee district court's ruling, the transferor circuit

courts would all apply the transferee circuit's case law, and in conducting this review they would be aided by the opinion of the transferee district court.[29] (The transferor circuit courts would thus be placed in a far more advantageous position than is the transferee district court under the New York plaintiffs' suggestion, which would often have to engage in pure guesswork, entirely without guidance about how a court in another circuit would rule.) Furthermore, transferor circuit courts are far less likely to reach conflicting conclusions if they all interpret transferee circuit case law than if they each exercise independent judgment. Consequently, unraveling is not likely to occur under this rule.

The second option is also more attractive because it involves a lesser departure from the norm of independent judgment. Whereas a transferee district judge must make frequent rulings, few cases ever return to the transferor courts and—unlike the first option—the second option would not create any greater incentive for a litigant to persist until the case is remanded. Moreover, in only a few of those that do return will the transferor circuit court have to review a ruling of the transferee district judge on an issue of federal law that will create disagreement among the circuits and thereby require the transferor circuit court, in applying transferee circuit case law, to issue a decision that does not reflect its own view.[30]

The third option entails all of the benefits of efficiency and consistency and none of the drawbacks of the second option. Insofar as transfer is burdensome for

---

**29.** It may also be that the transferor circuit courts should afford some deference to the transferee district court's application of transferee circuit case law. *Cf. Bishop v. Wood,* 426 U.S. 341, 345–46 & n. 10, 96 S.Ct. 2074, 2077–78 & n. 10, 48 L.Ed.2d 684 (1976); *Abex Corp. v. Maryland Cas. Co.,* 790 F.2d 119, 121 (D.C.Cir. 1986); *Hull v. Eaton,* 825 F.2d 448, 454 n. 9 (D.C.Cir.1987).

**30.** In fact, the litigation that followed the Second Circuit's ruling in *Polish Airlines* illustrates this. As indicated above, *supra* note 16 and accompanying text, *Polish Airlines* was decided on interlocutory appeal from a ruling by the transferee district court. After pretrial proceed-

ings were complete, the cases were remanded to the transferor courts for trial. On appeal from one of these trials, the Ninth Circuit held that calculation of damages was governed by the law of Poland, not that of California. *Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000 (9th Cir. 1987). Accordingly, the plaintiffs received $75,-399.78 in damages, $10,000 less than they would have received under California law. Given this disposition, it is not surprising that the Ninth Circuit merely mentions the Second Circuit's holding in passing, *id.,* at 1001 since the question of whether the Convention's $75,000 damage litigation applied had become all but irrelevant.

plaintiffs, however, it would tend to magnify their hardship, especially if they are to testify at trial. This detriment may be more or less offset by the reciprocal advantage accruing to a defendant that does not have to defend multiple trials at different places. A risk-averse defendant, on the other hand, might value the diversification of risk attendant to multiple trials, rather than having everything depend—even more than it already does as a result of the relaxation of the mutuality requirement for plaintiffs' use of estoppel—upon the fortuities of a single proceeding. As between the second and third options, therefore, considerable study would be needed in order to make an informed judgment, one that balances the goals of judicial economy and consistency against the distribution of costs imposed on plaintiffs and defendants in the course of realizing those goals.

## III. CONCLUSION

As a court, however, we must address the statute as it is, not as it might be. Nothing in the Supreme Court's opinion in *Van Dusen* nor in the language of section 1407(a) requires a federal court to engage in the unprecedented practice of interpreting federal law through the analytical prism of another circuit's case law. The New York plaintiffs have not shown, nor can I imagine, how the purposes underlying section 1407(a) would be furthered rather than frustrated by that approach. Under these circumstances, I can see no reason to condemn transferee district courts to perform often futile exercises in mental gymnastics.

Accordingly, I reject the New York plaintiffs' argument and join the court's opinion holding that our interpretation of the Warsaw Convention must be applied to all the cases before us.