**SIERRA CLUB, et al., Plaintiffs,**

v.

**Robert B. FLOWERS, Chief of Engineers, Army Corps of Engineers, et al., Defendants.**

**Civil Action No. 02–1652 (RMU).**

United States District Court, District of Columbia.

Aug. 4, 2003.

Jonathan Russell Lovvorn, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Mark A. Brown, U.S. Department of Justice, Wildlife & Marine Rescue, Washington, DC, Rafe Petersen, Holland & Knight, L.L.P., George J Terwilliger, White & Case, L.L.P., Washington, DC, for Federal Defendants/Movants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### TRANSFERRING THE ACTION TO THE SOUTHERN DISTRICT OF FLORIDA

## I. INTRODUCTION

This matter is before the court on the defendants' motion to transfer venue to the Southern District of Florida. The plaintiffs are the Sierra Club, the Natural Resources Defense Council, and the National Parks Conservation Association. They bring suit against the Army Corps of Engineers ("the Corps") and the Fish and Wildlife Service ("the Service") (collectively, "the defendants") for allegedly violating several federal environmental statutes by issuing mining permits for certain Everglades wetlands in southern Florida. The plaintiffs seek declaratory and injunctive relief setting aside the Corps' decision to issue the permits and enjoining the Corps from authorizing further mining until the defendants meet the relevant statutory requirements. In response, the defendants filed an answer and a motion to transfer the action to the Southern District of Florida. Because the plaintiffs could have brought this action in the Southern District of Florida, and considerations of convenience and the interest of justice weigh in favor of transferring the action to that district, the court grants the defendants' motion.

## II. BACKGROUND

### A. Factual Background

According to the plaintiffs, Florida contains some of the most imperilled ecosystems in the United States. Compl. ¶ 44. The Everglades ecosystem, which spans

the southern tip of Florida and most of Florida Bay, is home to a large number of rare species of wildlife, including wading birds such as the endangered wood stork. *Id.* ¶ 46. Over the past 100 years, however, the Everglades ecosystem has suffered as a result of human development. *Id.* ¶ 47.

In 2000, the president signed legislation authorizing the Corps to initiate a Comprehensive Everglades Restoration Plan ("CERP") for the South Florida ecosystem. *Id.* ¶ 50. The South Florida ecosystem includes the Lake Belt area, a 60,000–acre area of short hydro-period wetlands, portions of which are adjacent to the Everglades National Park. *Id.* ¶¶ 49, 51; Defs.' Mot. to Transfer ("Defs.' Mot.") at 3; Answer ¶ 49. The Corps designed the CERP to restore and protect the water resources of central and southern Florida by, among other things, improving the quality of water discharged into the system and by removing internal levees and other manmade structures. Compl. ¶¶ 50–51; Defs.' Mot. at 3. The restoration activities of the CERP include the creation of the Lake Belt Storage Area, which will use reservoirs to store untreated water to restore the hydrology of the Everglades National Park. Compl. ¶ 52.

Meanwhile, at the state level, the Miami–Dade County Lake Belt Plan Implementation Committee issued the Miami–Dade County Lake Belt Plan. Defs.' Mot. at 2. The Lake Belt Plan, adopted by the Florida legislature, recommended the creation of a freshwater lake system to replace the expanding "checkerboard mosaic" of quarried lakes. *Id.* Toward that end, the Lake Belt Plan authorized the excavation of limerock and sand from parts of the Lake Belt area subject to a per-ton fee, which in turn would be used to acquire mitigation land. *Id.* at 3.

In keeping with CERP water-storage proposals and pursuant to the Lake Belt Plan, the Corps proposed issuing a series of 50–year mining permits affecting 15,000 acres of wetlands in the Lake Belt area. *Id.* at 2–3; Compl. ¶ 53; Defs.' Reply at 11. In early 1999, the Corps issued a draft environmental impact statement ("EIS") indicating that the proposed mining would affect 15,800 acres in the Lake Belt area. Compl. ¶ 54. In response, several federal natural-resources agencies submitted comments that identified environmental risks associated with the draft EIS. *Id.* ¶ 55. In May 2000, the Corps issued a final EIS that, in the plaintiffs' view, failed to address the concerns of the federal agencies and other commentators regarding the draft EIS. *Id.* ¶¶ 55–62. In June 2000, the Corps released a proposal to issue several 50–year permits affecting more than 10,000 acres in the Lake Belt area. *Id.* ¶ 64. In addition, because the Corps believed the permits would have no effect on the endangered wood stork, the Corps indicated that it would not engage in formal Endangered Species Act ("ESA") consultations with the Service. *Id.* ¶ 65. The Service responded by pointing out that the Lake Belt area was a foraging site for endangered wood storks and informed the Corps that it must comply with ESA consultation requirements. *Id.* ¶¶ 71–72.

In March 2001, the Corps revised its proposal by reducing the duration of the permits from 50 to 10 years and the area of impact from 10,000 to approximately 5,000 acres. *Id.* ¶ 76; Answer ¶ 86. According to the plaintiffs, the revised proposal again met with criticism from several federal agencies, as well as from conservation organizations and private citizens. *Id.* ¶¶ 77–78. This time, however, the Service concurred in the Corps' conclusion that the permits would not adversely affect the endangered wood stork. *Id.* ¶ 82. In April 2002, the Corps issued a final record of

decision on the May 2001 EIS in which it incorporated the agency's March 2001 revised proposal. *Id.* ¶ 86; Answer ¶ 86.

### B. Procedural History

On August 20, 2002, the plaintiffs filed their complaint. First, the plaintiffs allege that in deciding to issue the permits, the Corps violated the Clean Water Act, 33 U.S.C. § 1344 *et seq.;* the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 701 *et seq.;* the ESA, 16 U.S.C. § 1531 *et seq.;* the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.;* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq.* Compl. ¶¶ 1, 91, 93, 100. Second, the plaintiffs allege that the Service violated the ESA and the APA when it concurred with the Corps' finding that no ESA consultation was necessary before issuing the permits. Compl. ¶ 2. On October 21, 2002, the defendants filed an answer accompanied by their motion to transfer. On October 25, 2002, several mining companies ("the movant-intervenors") filed motions to intervene. The court now turns to the defendants' motion to transfer.

### III. ANALYSIS

#### A. Legal Standard for Transfer to Another District

Section 1404(a) of Title 28 of the U.S.Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). This statute vests "discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack*, 376

U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). In this circuit, courts must examine challenges to venue particularly carefully "to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C.Cir.1993). Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere." *Id.*

■ Under section 1404(a), the movant, who bears the burden of establishing that transfer is proper, must make two showings to justify transfer. *Trout Unlimited v. Dep't of Agric.*, 944 F.Supp. 13, 16 (D.D.C.1996). First, the defendant must establish that the plaintiff originally could have brought the action in the proposed transferee district. *Van Dusen*, 376 U.S. at 622, 84 S.Ct. 805. Second, the defendant must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that court. *Trout Unlimited*, 944 F.Supp. at 16. As to the second showing, the statute directs the court to weigh a number of case-specific private-interest and public-interest factors. *Stewart Org.*, 487 U.S. at 29, 108 S.Ct. 2239. The private-interest factors include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof. *Trout Unlimited*, 944 F.Supp. at 16. The public-interest factors include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in deciding local controversies at home. *Trout Unlimited*, 944 F.Supp. at 16.

## B. The Court Grants the Defendants' Motion to Transfer the Action to the Southern District of Florida

The defendants assert that the pending action satisfies all of the requirements for transfer to the Southern District of Florida. Defs.' Mot. at 5–10. First, the defendants argue that the plaintiffs could have brought suit in that district because the permits at issue authorize rock-mining in western Miami–Dade County, which is located in the Southern District of Florida. *Id.* at 5–6. Second, the defendants assert that convenience and the interest of justice favor transfer because the plaintiffs' claims are regional in nature and specific to the Southern District of Florida; the defendants' decision-making and document creation relating to the permits occurred in Florida; most of the public comments on the permits received came from Florida agencies and residents; the plaintiffs' respective memberships include thousands of Florida residents; and the mining companies holding the permits have major facilities in Florida, own land in Florida and employ Florida residents. *Id.* at 1, 6, 8–10; Defs.' Reply at 3–4, 9–11.

Emphasizing the presumption in favor of the plaintiff's choice of forum, the plaintiffs contend that the court should not transfer this action to the Southern District of Florida. Pls.' Opp'n at 8–9. Describing the Everglades wetlands as an "American treasure" whose protection is of national interest, the plaintiffs assert that precedent demonstrates a strong preference for resolving environmental claims in the District of Columbia. *Id.* at 2–4, 11–13, 17–19. The plaintiffs also state that transfer would not be convenient, as the parties, their counsel, and some of the agency decision-makers are located in the District of Columbia, and as no witnesses are re-

quired for administrative review cases. *Id.* at 2–3, 6–10.

### 1. The Plaintiffs Could Have Brought the Action in the Southern District of Florida

As noted, a threshold question under section 1404(a) is whether the plaintiff originally could have brought the action in the proposed transferee forum. *Van Dusen,* 376 U.S. at 622, 84 S.Ct. 805; *Trout Unlimited,* 944 F.Supp. at 16. Venue is proper in any judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(2). In the instant case, "much of the decision-making process occurred in federal agency offices in Florida." Defs.' Reply at 3, Ex. 1 ("Hall Aff.") at 2. Moreover, the entire Everglades ecosystem, including the Lake Belt area in which the mining is to occur, is situated in Florida. Compl. ¶ 51. Thus, there is no question that venue is proper in the Southern District of Florida.[1] 28 U.S.C. § 1391(e)(2); *e.g., Greater Yellowstone Coalition v. Bosworth,* 180 F.Supp.2d 124, 128 (D.D.C.2001) (concluding that venue was proper in Montana in part because some of the operative facts occurred in Montana); *Trout Unlimited,* 944 F.Supp. at 16 (finding venue proper in Colorado because the plaintiffs' claims arose out of a nucleus of facts involving property situated entirely within Colorado).

### 2. The Balance of Private and Public Interests Weighs in Favor of Transfer

█  Even when the action could have been brought in the transferee forum,

---

1. The plaintiffs appear to concede that venue is proper in the Southern District of Florida. *See generally* Pls.' Opp'n; *see also* Defs.' Reply at 1, 3.

however, the court may transfer the action only if the balance of private and public interests weigh in favor of transfer. *Greater Yellowstone,* 180 F.Supp.2d at 127. Here, the defendants must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer. *Trout Unlimited,* 944 F.Supp. at 16. The court determines that, on balance, the private and public interests weigh in favor of transferring the case to the Southern District of Florida.

### a. Private–Interest Factors

The private-interest factors include (1) the plaintiffs' choice of forum, (2) the defendants' choice of forum, (3) whether the claim arose elsewhere, (4) the convenience of the parties, (5) the convenience of the witnesses, and (6) the ease of access to sources of proof. *Id.* Taken together, these factors favor transfer of this action.[2]

With regard to the first private-interest factor, courts generally must afford substantial deference to a plaintiff's choice of forum. *Greater Yellowstone,* 180 F.Supp.2d at 128. This deference, however, is mitigated if a plaintiff's choice of forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 13 (D.D.C.2000). When the connection between the controversy, the plaintiff, and the chosen forum is attenuated, the court pays less deference to plaintiffs' choice of forum. *Airport Working Group of Orange County, Inc. v. Dep't of Defense,* 226 F.Supp.2d 227, 231 (D.D.C.2002).

The defendants contend that the plaintiffs' choice of forum deserves less deference because there is "no discernable connection" between the issuance of the permits and the District of Columbia other than the fact that the plaintiffs and the defendants have offices in the District of Columbia. Defs.' Mot. at 9. In response, the plaintiffs assert that their choice of forum deserves great deference because the connection to this forum is not attenuated. Pls.' Opp'n at 9. They note that the defendants are federal officials located in the District of Columbia and the plaintiffs are national environmental organizations with offices in the District of Columbia. *Id.* at 9. In addition, the plaintiffs maintain that there exists "overwhelming precedent" in this circuit for resolving environmental claims in the District of Columbia notwithstanding the fact that the animals or habitat at issue may be located elsewhere, particularly for "nationally significant, federally protected resources." *Id.* at 10–14.

The court determines that the plaintiffs' choice of forum merits little deference because the District of Columbia has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Wilderness Soc'y,* 104 F.Supp.2d at 13. First, the fact that the parties each have offices in the District of Columbia is not dispositive of the question of deference. *Kafack v. Primerica Life Ins. Co.,* 934 F.Supp. 3, 7 (D.D.C.1996) (noting that cases decided under section 1404(a) place much less emphasis on the parties' residence). Here, the parties' presence in the District of Columbia is overshadowed by the lack of evidence that federal officials in this forum played "an active or significant role" in the decision to issue the permits. *Airport Working Group,* 226 F.Supp.2d at 230; *e.g., Trout Unlimited,* 944 F.Supp. at

---

**2.** Because its analysis of the plaintiffs' choice of forum touches on both the second factor (defendants' choice of forum) and the third factor (whether the claim arose elsewhere), the court does not analyze those factors separately, but simply notes that both weigh in favor of transfer.

18 (declining to defer to the plaintiffs' choice of forum because the decision-making process occurred in Colorado, not in the District of Columbia); *cf. Greater Yellowstone*, 180 F.Supp.2d at 128–29 (deferring to the plaintiffs' choice of forum in part because federal officials in the District of Columbia were involved in the grazing-permit decision at issue). Federal officials in Florida, not the District of Columbia, signed the final record of decision authorizing the permits. Defs.' Reply at 6. As for the process leading up to the final decision, the chief of the regulatory division of the Corps' Jacksonville District affirms that "[t]here was no Washington-level involvement in any part of the decision-making process concerning the Lake Belt permitting."[3] Hall Aff. at 2. The lack of meaningful ties between the controversy and the District of Columbia stands in sharp contrast to the significant ties—outlined in detail in Part III.B.2.b, *infra*—between the controversy and Florida.

Finally, notwithstanding the slew of cases cited by the plaintiffs, precedent in this circuit does not require or even encourage resolution in this forum of ESA and other environmental claims involving nationally known resources. Rather, courts in this circuit conduct "an individualized, case-by-case" inquiry to determine whether transfer of venue is warranted under section 1404(a). *E.g., Joyner v. District of Columbia*, 2003 WL 21398879, at *5 (D.D.C. June 2, 2003) (citing *Stewart Org.*, 487 U.S. at 29, 108 S.Ct. 2239). The battle of cases in which the parties engage serves only to underscore this point. Pls.' Opp'n at 10–14; Defs.' Reply at 6–7. Accordingly, the plaintiffs' choice of forum

does not warrant deference simply because the plaintiffs bring an ESA claim involving the nationally known Everglades ecosystem. *E.g., Miccosukee Tribe of Indians v. Atlantic Sugar Ass'n, Inc.*, No. 99–2464, slip op. at 9 (D.D.C. Dec. 28, 2000) (declining to defer to the plaintiffs' choice of forum in environmental suit involving Everglades water resources). Here, given that federal officials in the District of Columbia did not play an active role in the permitting decision, the court concludes that the national significance of the Everglades ecosystem does not tilt the balance in favor of deferring to the plaintiffs' choice of forum. *Cf. Greater Yellowstone*, 180 F.Supp.2d at 128–29 (deferring to the plaintiffs' choice of this forum because federal officials in the District of Columbia were involved in a grazing-permit decision of national significance).

In sum, the plaintiffs' choice of forum merits little deference because the District of Columbia has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Wilderness Soc'y*, 104 F.Supp.2d at 13. The court therefore finds that this private-interest factor weighs in favor of transfer.

■ With regard to the remaining private-interest factors—the convenience of the parties and witnesses, and the ease of access to proof—the defendants argue that all three favor transfer to the Southern District of Florida because the federal officials who made the decisions regarding the permits are located in or near that district, the plaintiffs have thousands of members in Florida, the movant-intervenors are based in Florida, such witnesses as may be

---

**3.** To demonstrate that the defendants have not met their burden, the plaintiffs argue that "it strains all credulity" to suggest that the Corps developed its permitting proposal without consulting officials in the District of Columbia. Pls.' Opp'n at 10. This conclusory statement, unsupported by any evidence of consultation between the federal officials in Florida and their counterparts in the District of Columbia, contrasts sharply with the defendants' sworn affidavit. *Id.* Therefore, the defendants have carried their burden.

necessary are located in Florida, and the federal officials created the administrative record in Florida. Defs.' Mot. at 10 & Ex. 1 at 2; Defs.' Reply at 9–10. The plaintiffs assert that the defendants have not shown that transfer would be more convenient for any party, as counsel for all parties (including the movant-intervenors) are located in the District of Columbia, and litigating in the Southern District of Florida would increase the plaintiffs' litigation costs. Pls.' Opp'n at 15–17. As for the convenience of witnesses, the plaintiffs point out that "there are not going to be any witnesses *at all*" because the court will decide the issues in this administrative-review case on the law. *Id.* at 17 (emphasis in original). Finally, the plaintiffs state that the task of sending the administrative record to this court is not a substantial inconvenience.[4] *Id.* at 17 n. 4.

The court concludes that the convenience factors weigh marginally in favor of transfer to the Southern District of Florida. Because this action involves an administrative review that the court is likely to determine on the papers, the location of counsel—already given "little, if any, weight" in transfer determinations—makes

no difference here. *Vencor Nursing Ctrs. v. Shalala,* 63 F.Supp.2d 1, 6 n. 4 (D.D.C. 1999). For the same reasons, the location of witnesses is not a significant factor.[5] *Trout Unlimited,* 944 F.Supp. at 18. The location of the administrative record, however, carries some weight in transfer determinations, and here, this factor weighs in favor of transfer. *Id.* (finding that convenience weighed in favor of transfer because litigating an action in the District of Columbia would require a "voluminous record" to be transferred from Colorado); *but see Air Line Pilots Ass'n v. Eastern Air Lines,* 672 F.Supp. 525, 527 (D.D.C.1987) (noting that since the record had to be shipped to the parties' District-based counsel it was not "a significantly greater hardship" to send a copy to the courthouse as well). Accordingly, the convenience factors add slightly to the balance in favor of transfer. *Trout Unlimited,* 944 F.Supp. at 18.

### b. Public–Interest Factors

As mentioned, the public-interest factors include (1) the transferee's familiarity with the governing laws, (2) the relative congestion of the calendars of the potential trans-

---

4. The plaintiffs raise one additional argument: that because the 11th Circuit's interpretation of the MBTA effectively would result in dismissal of their MBTA claim by the Southern District of Florida, the court should not transfer the action. Pls.' Opp'n at 19–20. In federal-question cases, transfer is permissible even when the transferee forum is in a circuit that has interpreted a federal law differently than the circuit of the transferor forum. *See Hartline v. Sheet Metal Workers' Nat'l Pension Fund,* 201 F.Supp.2d 1, 3–4 (D.D.C.1999) (citing *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1174 (D.C.Cir.1987)), *aff'd,* 286 F.3d 598 (D.C.Cir. 2002) (*per curiam*). As our court of appeals has noted,

venue provisions are designed with geographical convenience in mind, and not to guarantee that the plaintiff will be able to select the law that will govern the case[.

Because] the federal courts comprise a single system in which each tribunal endeavors to apply a single body of law ... there is no compelling reason to allow plaintiff to capture the most favorable interpretation of that law simply and solely by virtue of his or her right to choose the place to open the fray.

*In re Korean Air Lines,* 829 F.2d at 1175 (internal quotations omitted). Accordingly, the plaintiffs' argument is entitled to no weight in the court's section 1404(a) analysis.

5. The defendants point out that if the plaintiffs seek interim injunctive relief, witnesses may be necessary to determine the public-interest concerns associated with such relief. Defs.' Mot. at 10. Because of the speculative nature of this possibility, the court gives it little weight in the analysis.

feree and transferor courts, and (3) the local interest in deciding local controversies at home. *Trout Unlimited,* 944 F.Supp. at 16. Although neither the first nor second public-interest factor influences this analysis, the third factor—the local interest in deciding local controversies at home—weighs strongly in favor of transfer.[6]

"[I]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home." *Adams v. Bell,* 711 F.2d 161, 167 (D.C.Cir.1983) (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), *superseded by statute on other grounds* ). This rationale applies to controversies involving federal decisions that impact the local environment, and to controversies requiring judicial review of an administrative decision. *Trout Unlimited,* 944 F.Supp. at 19–20. To determine whether a controversy is local in nature, courts have taken into account a wide variety of factors. *E.g., id.* at 20 (noting that the proposed intervenors were located in Colorado, a great number of comments came from Colorado citizens, the decision was made in Colorado, and the decision directly affected Colorado residents); *McClamrock v. Eli Lilly & Co.,* 267 F.Supp.2d 33, 41–42 (D.D.C.2003) (noting that the alleged injury occurred in North Carolina to a North Carolina resident, and that transfer would not result in delay in resolving the case); *Initiative & Referen-*

*dum Inst. v. United States Postal Serv.,* 154 F.Supp.2d 10, 16 (D.D.C.2001) (noting that the disputed issue involved federal constitutional issues rather than local property laws or statutes); *Greater Yellowstone,* 180 F.Supp.2d at 129 (noting that the disputed issue did not involve any issues of state law and had some national significance); *Reiffin v. Microsoft Corp.,* 104 F.Supp.2d 48, 52 n. 8 (D.D.C.2000) (noting that the alleged injury took place in California); *Wilderness Soc'y,* 104 F.Supp.2d at 17 (noting that the disputed issue received national media attention and the personal involvement of the Secretary of the Interior); *BWX Elecs., Inc. v. Control Data Corp.,* 1987 WL 19212, at *2 (D.D.C. Oct.22, 1987) (noting that the disputed property was located within the District of Columbia).

In this case, the defendants argue that the controversy is local to Florida, pointing to the allegations that the permits will impact Everglades resources, the leading role that federal officials in Florida played in the decision to issue the permits, the extensive involvement of state and local officials in developing the Corps' May 2000 EIS, and the fact that a substantial majority of public comments on the May 2000 EIS came from Florida-based organizations or individuals. Defs.' Mot. at 7–8; Defs.' Reply at 3–4. In contrast, the plaintiffs maintain that the controversy is national in scope, stressing the national significance of the Everglades; the concerns expressed by members of Congress, executive-branch agencies, and national environmental organizations regarding the decision to issue the permits; and national

---

**6.** The first public-interest factor is of little significance here, as the plaintiffs base all of their claims on federal environmental law, and courts follow "the principle that the transferee federal court is competent to decide federal issues correctly." *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1175 (D.C.Cir.1987) (internal citations omitted). The second public-interest factor likewise plays no role in the analysis because the court has no reason to believe that the transferee court is more or less congested than this court.

media coverage of that decision. Pls' Opp'n at 6–7, Exs. 6–7; Compl. ¶ 75.

The court concludes that the decision to issue the permits is a controversy local to Florida and is one in which Florida and its residents have a great interest. The fact that the plaintiffs' claims invoke federal law, relate to the Everglades, and are brought by national environmental organizations, coupled with the fact that the decision was the subject of two national news articles, indicate that the controversy has a national aspect. *Greater Yellowstone,* 180 F.Supp.2d at 129; *Wilderness Soc'y,* 104 F.Supp.2d at 17; *Initiative,* 154 F.Supp.2d at 16. But the depth and extent of Florida's interest is indisputable. *Trout Unlimited,* 944 F.Supp. at 19; *BWX Elecs. v. Control Data Corp.,* 1987 WL 19212, at *2. The Corps' issuance of the permits is but one part of a larger multi-year debate among South Floridians regarding the Everglades ecosystem and the Lake Belt area in particular.[7] The Corps issued the permits to meet the objectives of the Lake Belt Plan, drafted by a state committee and adopted by the Florida legislature. The mining companies to whom the Corps issued the permits, and who now move to intervene in this action, are located in Florida. *Trout Unlimited,* 944 F.Supp. at 20. Not surprisingly, Florida agencies, organizations, and residents—those whom the permits will directly affect—submitted the majority of public comments on the

potential impact of mining in the Lake Belt area under the May 2000 EIS. *Id.; McClamrock,* 267 F.Supp.2d at 41–42; *Reiffin,* 104 F.Supp.2d at 52 n. 8. As for the involvement of federal officials, the decision-making process up to and including the final record of decision took place not in Washington but in Florida. *Trout Unlimited,* 944 F.Supp. at 20. Moreover, the members of Congress to whose letters the plaintiffs cite all represent Floridians, thereby underscoring the unique importance that the permits hold for residents of Florida.[8] In short, the court concludes that there is a strong local interest in having this action decided in the Southern District of Florida. *Adams,* 711 F.2d at 167.

In sum, the court concludes that the defendants have demonstrated that the plaintiffs could have brought the action in the Southern District of Florida and that considerations of convenience and the interest of justice weigh in favor of transfer to that district. *Trout Unlimited,* 944 F.Supp. at 16. The court therefore grants the defendants' motion to transfer. 28 U.S.C. § 1404(a); *Stewart Org.,* 487 U.S. at 29, 108 S.Ct. 2239.

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to transfer this action to the Southern District of Florida.[9] An order directing the parties in

---

7.  *See, e.g.,* Pls.' Opp'n Ex. 1 (Apr. 12, 2002 article from the South Florida Sun–Sentinel).

8.  The four letters that the plaintiffs cite are from U.S. Senator Bob Graham, and U.S. Representatives Peter Deutsch and Lincoln Diaz–Balart, both of whose districts include portions of Dade County. Compl. ¶ 75; Pls.' Opp'n Exs. 6–7. The court notes that according to the plaintiffs' description, Representative Diaz–Balart addressed his letter to the chief of the regulatory division of the Corps' Jacksonville District and stated that the min-

ing plan is "of great importance [to] the citizens of Miami–Dade County" as "the issue to be addressed is one that greatly concerns them, their homes, and their quality of life." Compl. ¶ 75. Similarly, Senator Graham, who wrote two letters, addressed both to the district engineer of the Corps' Jacksonville District, and asked him to respond to the senator's office in Florida. Pls.' Opp'n Ex. 7.

9.  Because the court transfers this action, it leaves the pending motions to intervene to the

a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 4th day of August, 2003.

sound discretion of its sister court in the Southern District of Florida.